(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TENNESSEE WINE AND SPIRITS RETAILERS ASSN. *v.* RUSSELL F. THOMAS, EXECUTIVE DIRECTOR OF THE TENNESSEE ALCOHOLIC BEVERAGE COMMISSION, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 18–96.   Argued January 16, 2019—Decided June 26, 2019

Tennessee law imposes durational-residency requirements on persons and companies wishing to operate retail liquor stores, requiring applicants for an initial license to have resided in the State for the prior two years; requiring an applicant for renewal of a license to reside in the State for 10 consecutive years; and providing that a corporation cannot obtain a license unless all of its stockholders are residents. Following the state attorney general's opinion that the residency requirements discriminated against out-of-state economic interests in violation of the Commerce Clause, the Tennessee Alcoholic Beverage Commission (TABC) declined to enforce the requirements.

Two businesses that did not meet the residency requirements (both respondents here) applied for licenses to own and operate liquor stores in Tennessee. Petitioner Tennessee Wine and Spirits Retailers Association (Association)—a trade association of in-state liquor stores—threatened to sue the TABC if it granted the licenses, so the TABC's executive director (also a respondent) filed a declaratory judgment action in state court to settle the question of the residency requirements' constitutionality. The case was removed to Federal District Court, which found the requirements unconstitutional. The State declined to appeal, but the Association took the case to the Sixth Circuit. It affirmed, concluding that the provisions violated the Commerce Clause. The Association petitioned for certiorari only with respect to the Sixth Circuit's decision to invalidate the 2-year residency requirement applicable to initial liquor store license appli-

cants.

*Held*: Tennessee's 2-year durational-residency requirement applicable
to retail liquor store license applicants violates the Commerce Clause
and is not saved by the Twenty-first Amendment.  Pp. 6–37.

(a) The Commerce Clause by its own force restricts state protec-
tionism.  Removing state trade barriers was a principal reason for the
adoption of the Constitution, and at this point no provision other
than the Commerce Clause could easily do that job.  The Court has
long emphasized the connection between the trade barriers that
prompted the call for a new Constitution and its dormant Commerce
Clause jurisprudence.  See *Guy* v. *Baltimore*, 100 U. S. 434, 440;
*Granholm* v. *Heald*, 544 U. S. 460, 472.  Pp. 6–10.

(b) Under the dormant Commerce Clause cases, a state law that
discriminates against out-of-state goods or nonresident economic ac-
tors can be sustained only on a showing that it is narrowly tailored to
"advanc[e] a legitimate local purpose."  *Department of Revenue of Ky.*
v. *Davis*, 553 U. S. 328, 338.  Tennessee's 2-year residency require-
ment plainly favors Tennesseans over nonresidents.  P. 10.

(c) Because the 2-year residency requirement applies to the sale of
alcohol, however, it must be evaluated in light of §2 of the Twenty-
first Amendment.  Pp. 10–20.

(1) Section 2's broad text—the "transportation or importation into
any State, Territory, or possession of the United States for delivery
or use therein of intoxicating liquors, in violation of the laws thereof,
is hereby prohibited"—could be read to prohibit the transportation or
importation of alcoholic beverages in violation of *any* state law.  But
the Court has declined to adopt that reading, instead interpreting §2
as one part of a unified constitutional scheme and in light of the pro-
vision's history.  History teaches that §2's thrust is to "constitutional-
iz[e]" the basic structure of federal-state alcohol regulatory authority
that prevailed prior to the Eighteenth Amendment's adoption.  *Craig*
v. *Boren*, 429 U. S. 190, 206.  Pp. 10–12.

(2) This Court invalidated many state liquor regulations before
the Eighteenth Amendment's ratification, and by the late 19th centu-
ry it had concluded that the Commerce Clause both prevented States
from discriminating "against citizens and products of other States,"
*Walling* v. *Michigan*, 116 U. S. 446, 460, and "prevented States from
passing facially neutral laws that placed an impermissible burden on
interstate commerce," *Granholm,* 544 U. S., at 477.  State bans on
the production and sale of alcohol within state borders were rendered
ineffective by the "original-package doctrine," which made "goods
shipped in interstate commerce . . . immune from state regulation
while in their original package."  *Ibid.*  Congress responded by pass-
ing the Wilson Act, which provided that all alcoholic beverages

"transported into any State or Territory" were subject "upon arrival" to the same restrictions imposed by the State "in the exercise of its police powers" over alcohol produced in the State, *i.e.,* bona fide health and safety measures. This Court, however, narrowly construed the term "arrival" in the Wilson Act as arrival to the consignee rather than arrival within the State's borders, which allowed consumers to continue to receive direct shipments of alcohol from out of State. Congress passed the Webb-Kenyon Act to close that loophole. But, as this Court's decision in *Granholm* determined, the Webb-Kenyon Act was not intended to override the rule barring States from discriminating against out-of-state citizens and products, nor the traditional limits on state police power. Thereafter, the Eighteenth Amendment was ratified, prohibiting the manufacture, sale, transportation, and importation of alcoholic beverages across the country. Pp. 12–20.

(d) Section 2 of the Twenty-first Amendment grants the States latitude with respect to the regulation of alcohol, but it does not allow the States to violate the "nondiscrimination principle" that was a central feature of the regulatory regime that the provision was meant to constitutionalize. *Granholm, supra,* at 487. Pp. 20–32.

(1) The Twenty-first Amendment ended nationwide Prohibition, but §2 gave each State the option of banning alcohol if its citizens so chose. Its text "closely follow[ed]" the Webb-Kenyon Act's operative language, suggesting that it was meant to have a similar meaning. *Craig* v. *Boren*, 429 U. S., at 205–206. The provision was meant to "constitutionaliz[e]" the basic understanding of the extent of the States' power to regulate alcohol that prevailed before Prohibition. *Id.,* at 206. And during that period, the Commerce Clause did not permit the States to impose protectionist measures clothed as police-power regulations. Pp. 20–22.

(2) At first, the Court did not take account of this history. But it has since recognized that §2 cannot be interpreted to override all previously adopted constitutional provisions, scrutinizing state alcohol laws for compliance with, *e.g.,* the Free Speech Clause, *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484; the Establishment Clause, *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116; the Equal Protection Clause, *Craig* v. *Boren, supra*; the Due Process Clause, *Wisconsin* v. *Constantineau*, 400 U. S. 433; and the Import-Export Clause, *Department of Revenue* v. *James B. Beam Distilling Co.*, 377 U. S. 341. Section 2 also does not entirely supersede Congress's power to regulate commerce, see, *e.g., Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324, 333–334, nor is its aim to permit States to restrict the importation of alcohol for purely protectionist purposes, see, *e.g., Granholm, supra,* at 486–487. Pp. 22–23.

(3) Protectionism is not a legitimate §2 interest shielding state alcohol laws that burden interstate commerce. *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 276. The Court has applied that principle to invalidate state alcohol laws aimed at giving a competitive advantage to in-state businesses. See, *e.g., id.,* at 274. Pp. 24–26.

(4) The Association and the dissent's overly broad understanding of §2 is unpersuasive. They claim that, while §2 does not give the States the power to discriminate against out-of-state alcohol *products and producers*, a different rule applies to state laws regulating in-state alcohol distribution. There is no sound basis for this distinction. The Association and the dissent also claim that discriminatory distribution laws, including in-state residency requirements, long predate Prohibition and were adopted by many States following the Twenty-first Amendment's ratification. State laws adopted soon after ratification, however, may have been based on an overly expansive interpretation of §2 that can no longer be defended, and many state laws adopted before Prohibition were never tested in this Court. Nor have States historically enjoyed absolute authority to police alcohol within their borders. Section 2 allows each State leeway to enact measures to address the public health and safety effects of alcohol use and other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests. Pp. 26–32.

(d) Applying the appropriate §2 analysis here, Tennessee's 2-year residency requirement cannot be sustained. The provision expressly discriminates against nonresidents and has at best a highly attenuated relationship to public health or safety. The Association claims that the requirement ensures that retailers are subject to process in state courts, but does not explain why that objective could not easily be achieved by, *e.g.,* requiring a nonresident to designate an agent to receive process. Similarly unpersuasive is its claim that the requirement allows the State to ensure that only law-abiding and responsible applicants receive licenses. The State can thoroughly investigate applicants without requiring them to reside in the State for two years, and in any event the requirement poorly serves that goal since the TABC would have no reason to investigate a nonresident who moves to the State with the intention of applying for a license once the 2-year period ends. Nor is the residency requirement needed to enable the State to maintain oversight over liquor store operators; they can be monitored through any number of nondiscriminatory means, including on-site inspections, audits, and the like. There is also no evidence to support the claim that the requirement would promote responsible alcohol consumption because retailers who know the communities they serve will be more likely to engage in responsi-

Syllabus

ble sales practices. The residency requirement is poorly designed for such a purpose, and the State could better serve the goal without discriminating against nonresidents by, *e.g.,* limiting both the number of retail licenses and the amount of alcohol that may be sold to an individual, mandating more extensive training for managers and employees, or monitoring retailer practices and taking action against those who violate the law. Pp. 32–36.

883 F. 3d 608, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, SOTOMAYOR, KAGAN, and KAVANAUGH, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

-------------

No. 18–96

-------------

## TENNESSEE WINE AND SPIRITS RETAILERS ASSOCIATION, PETITIONER *v.* RUSSELL F. THOMAS, EXECUTIVE DIRECTOR OF THE TENNESSEE ALCOHOLIC BEVERAGE COMMISSION, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 26, 2019]

JUSTICE ALITO delivered the opinion of the Court.

The State of Tennessee imposes demanding durational-residency requirements on all individuals and businesses seeking to obtain or renew a license to operate a liquor store.  One provision precludes the renewal of a license unless the applicant has resided in the State for 10 consecutive years.  Another provides that a corporation cannot obtain a license unless all of its stockholders are residents.  The Court of Appeals for the Sixth Circuit struck down these provisions as blatant violations of the Commerce Clause, and neither petitioner—an association of Tennessee liquor retailers—nor the State itself defends them in this Court.

The Sixth Circuit also invalidated a provision requiring applicants for an initial license to have resided in the State for the prior two years, and petitioner does challenge that decision.  But while this requirement is less extreme than the others that the Sixth Circuit found to be uncon-

stitutional, we now hold that it also violates the Commerce Clause and is not shielded by §2 of the Twenty-first Amendment. Section 2 was adopted as part of the scheme that ended prohibition on the national level. It gives each State leeway in choosing the alcohol-related public health and safety measures that its citizens find desirable. But §2 is not a license to impose all manner of protectionist restrictions on commerce in alcoholic beverages. Because Tennessee's 2-year residency requirement for retail license applicants blatantly favors the State's residents and has little relationship to public health and safety, it is unconstitutional.

## I

### A

Tennessee, like many other States, requires alcoholic beverages distributed in the State to pass through a specified three-tiered system.[1] Acting through the Tennessee Alcoholic Beverage Commission (TABC), the State issues different types of licenses to producers, wholesalers, and retailers of alcoholic beverages. See Tenn. Code Ann. §57–3–201 (2018). Producers may sell only to licensed wholesalers; wholesalers may sell only to licensed retailers or other wholesalers; and only licensed retailers may sell to consumers. §57–3–404. No person may lawfully participate in the sale of alcohol without the appropriate license. See, *e.g.*, §57–3–406.

Included in the Tennessee scheme are onerous durational-

––––––––––

[1] For purposes of the provisions at issue here, Tennessee law defines "alcoholic beverage[s]" to include "spirits, liquor, wine, high alcohol content beer," and "any liquid product containing distilled alcohol capable of being consumed by a human being, manufactured or made with distilled alcohol, regardless of alcohol content," Tenn. Code Ann. §57–3–101(a)(1)(A) (2018). This definition excludes "beer," which is defined and regulated by separate statutory provisions, see §57–5–101(b).

residency requirements for all persons and companies wishing to operate "retail package stores" that sell alcoholic beverages for off-premises consumption (hereinafter liquor stores). See §57–3–204(a). To obtain an initial retail license, an individual must demonstrate that he or she has "been a bona fide resident" of the State for the previous two years. §57–3–204(b)(2)(A). And to renew such a license—which Tennessee law requires after only one year of operation—an individual must show continuous residency in the State for a period of 10 consecutive years. *Ibid.*

The rule for corporations is also extraordinarily restrictive. A corporation cannot get a retail license unless all of its officers, directors, and owners of capital stock satisfy the durational-residency requirements applicable to individuals. §57–3–204(b)(3). In practice, this means that no corporation whose stock is publicly traded may operate a liquor store in the State.

In 2012, the Tennessee attorney general was asked whether the State's durational-residency requirements violate the Commerce Clause, and his answer was that the requirements constituted "trade restraints and barriers that impermissibly discriminate against interstate commerce." App. to Brief in Opposition 11a; see also *id.*, at 12a (citing *Jelovsek* v. *Bredesen*, 545 F. 3d 431, 435 (CA6 2008)). In light of that opinion, the TABC stopped enforcing the requirements against new applicants. See App. 51, ¶9; *id.*, at 76, ¶10.

The Tennessee General Assembly responded by amending the relevant laws to include a statement of legislative intent. Citing the alcohol content of the beverages sold in liquor stores, the Assembly found that protection of "the health, safety and welfare" of Tennesseans called for "a higher degree of oversight, control and accountability for individuals involved in the ownership, management and control" of such outlets. §57–3–204(b)(4).

After the amendments became law, the attorney general was again asked about the constitutionality of the durational-residency requirements, but his answer was the same as before. See App. to Brief in Opposition 13a. Consequently, the TABC continued its practice of nonenforcement.

B

In 2016, respondents Tennessee Fine Wines and Spirits, LLC dba Total Wine Spirits Beer & More (Total Wine) and Affluere Investments, Inc. dba Kimbrough Fine Wine & Spirits (Affluere) applied for licenses to own and operate liquor stores in Tennessee. At the time, neither Total Wine nor Affluere satisfied the durational-residency requirements. Total Wine was formed as a Tennessee limited liability company but is owned by residents of Maryland, Brief for Respondent Total Wine 10; App. 51, ¶4–5, and Affluere was owned and controlled by two individuals who, by the time their application was considered, had only recently moved to the State, see App. 11–12, 20, 22.

TABC staff recommended approval of the applications, but petitioner Tennessee Wine and Spirits Retailers Association (the Association)—a trade association of in-state liquor stores—threatened to sue the TABC if it granted them. *Id.*, at 15, ¶17. The TABC's executive director (a respondent here) filed a declaratory judgment action in state court to settle the question of the residency requirements' constitutionality. *Id.*, at 17.

The case was removed to the United States District Court for the Middle District of Tennessee, and that court, relying on our decision in *Granholm* v. *Heald*, 544 U. S. 460 (2005), concluded that the requirements are unconstitutional. *Byrd* v. *Tennessee Wine and Spirits Retailers Assn.*, 259 F. Supp. 3d 785, 797 (2017). The State declined to appeal, and Total Wine and Affluere were issued licenses.

The Association, however, took the case to the Court of Appeals for the Sixth Circuit, where a divided panel affirmed. See *Byrd* v. *Tennessee Wine and Spirits Retailers Assn.*, 883 F. 3d 608 (2018). All three judges acknowledged that the Tennessee residency requirements facially discriminate against out-of-state economic interests. See *id.,* at 624; *id.,* at 634 (Sutton, J., concurring in part and dissenting in part). And all three also agreed that neither the 10-year residency requirement for license renewals nor the 100-percent-resident shareholder requirement is constitutional under this Court's Twenty-first Amendment and dormant Commerce Clause precedents. See *id.,* at 625–626; *id.,* at 635 (opinion of Sutton, J.).

The panel divided, however, over the constitutionality of the 2-year residency requirement for individuals seeking initial retail licenses, as well as the provision applying those requirements to officers and directors of corporate applicants. Applying standard dormant Commerce Clause scrutiny, the majority struck down the challenged restrictions, reasoning that they facially discriminate against interstate commerce and that the interests they are claimed to further can be adequately served through reasonable, nondiscriminatory alternatives. *Id.*, at 623–626. The dissent disagreed, reading §2 of the Twenty-first Amendment to grant States "'virtually' limitless" authority to regulate the in-state distribution of alcohol, the only exception being for laws that "serve no purpose besides 'economic protectionism.'" *Id.*, at 633 (quoting *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 276 (1984)). Applying that highly deferential standard, the dissent would have upheld the 2-year residency requirement, as well as the provision applying that requirement to all officers and directors of corporate applicants. The dissent argued that these provisions help to promote the State's interests in "responsible consumption" of alcohol and "orderly liquor markets." 883 F. 3d, at 633.

The Association filed a petition for a writ of certiorari challenging the decision on the 2-year residency requirement for initial licenses. Tennessee declined to seek certiorari but filed a letter with the Court expressing agreement with the Association's position.[2] We granted certiorari, 585 U. S. ___ (2018), in light of the disagreement among the Courts of Appeals about how to reconcile our modern Twenty-first Amendment and dormant Commerce Clause precedents. See 883 F. 3d, at 616 (collecting cases).

## II
## A

The Court of Appeals held that Tennessee's 2-year residency requirement violates the Commerce Clause, which provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, §8, cl. 3. "Although the Clause is framed as a positive grant of power to Congress," *Comptroller of Treasury of Md.* v. *Wynne*, 575 U. S. ___, ___ (2015) (slip op., at 5), we have long held that this Clause also prohibits state laws that unduly restrict interstate commerce. See, *e.g., ibid.*; *Philadelphia* v. *New Jersey*, 437 U. S. 617, 623–624 (1978); *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318–319 (1852); *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245, 252 (1829). "This 'negative' aspect of the Commerce Clause" prevents the States from adopting protectionist measures and thus preserves a national market for goods and services. *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273 (1988).

This interpretation, generally known as "the dormant

──────────

[2] See Letter from H. Slatery III, Tenn. Atty. Gen., to S. Harris, Clerk of Court (Nov. 13, 2018).

Commerce Clause," has a long and complicated history. Its roots go back as far as *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), where Chief Justice Marshall found that a version of the dormant Commerce Clause argument had "great force." *Id.*, at 209. His successor disagreed, see *License Cases*, 5 How. 504, 578–579 (1847) (Taney, C. J.), but by the latter half of the 19th century the dormant Commerce Clause was firmly established, see, *e.g.*, *Case of the State Freight Tax*, 15 Wall. 232, 279–280 (1873), and it played an important role in the economic history of our Nation. See Cushman, Formalism and Realism in Commerce Clause Jurisprudence, 67 U. Chi. L. Rev. 1089, 1107 (2000).

In recent years, some Members of the Court have authored vigorous and thoughtful critiques of this interpretation. See, *e.g.*, *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 609–620 (1997) (THOMAS, J., dissenting); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 259–265 (1987) (Scalia, J., concurring in part and dissenting in part); cf. *post*, at 2–3 (GORSUCH, J., dissenting) (deeming doctrine "peculiar"). But the proposition that the Commerce Clause by its own force restricts state protectionism is deeply rooted in our case law. And without the dormant Commerce Clause, we would be left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising.

That is so because removing state trade barriers was a principal reason for the adoption of the Constitution. Under the Articles of Confederation, States notoriously obstructed the interstate shipment of goods. "Interference with the arteries of commerce was cutting off the very lifeblood of the nation." M. Farrand, The Framing of the Constitution of the United States 7 (1913). The Annapolis Convention of 1786 was convened to address this critical problem, and it culminated in a call for the Philadelphia

Convention that framed the Constitution in the summer of 1787.[3]   At that Convention, discussion of the power to regulate interstate commerce was almost uniformly linked to the removal of state trade barriers, see Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn. L. Rev. 432, 470–471 (1941), and when the Constitution was sent to the state conventions, fostering free trade among the States was prominently cited as a reason for ratification.   In The Federalist No. 7, Hamilton argued that state protectionism could lead to conflict among the States, see The Federalist No. 7, pp. 62–63 (C. Rossiter ed. 1961), and in No. 11, he touted the benefits of a free national market, *id.*, at 88–89.   In The Federalist No. 42, Madison sounded a similar theme. *Id.*, at 267–268.

In light of this background, it would be strange if the Constitution contained no provision curbing state protectionism, and at this point in the Court's history, no provision other than the Commerce Clause could easily do the job.   The only other provisions that the Framers might have thought would fill that role, at least in part, are the Import-Export Clause, Art. I, §10, cl. 2, which generally prohibits a State from "lay[ing] any Imposts or Duties on Imports or Exports," and the Privileges and Immunities Clause, Art. IV, §2, which provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."   But the Import-Export Clause was long ago held to refer only to international trade.   See *Woodruff* v. *Parham*, 8 Wall. 123, 136–137 (1869).   And the Privileges and Immunities Clause has been interpreted not to protect corporations, *Western*

──────────

[3] See, *e.g.*, R. Beeman, Plain, Honest Men: The Making of the American Constitution 18–20 (2009); D. Stewart, The Summer of 1787: The Men Who Invented the Constitution 9–10 (2007); M. Farrand, The Framing of the Constitution of the United States 7–10 (1913).

*& Southern Life Ins. Co.* v. *State Bd. of Equalization of Cal.*, 451 U. S. 648, 656 (1981) (citing *Hemphill* v. *Orloff*, 277 U. S. 537, 548–550 (1928)), and may not guard against certain discrimination scrutinized under the dormant Commerce Clause, see Denning, Why the Privileges and Immunities Clause of Article IV Cannot Replace the Dormant Commerce Clause Doctrine, 88 Minn. L. Rev. 384, 393–397 (2003). So if we accept the Court's established interpretation of those provisions, that leaves the Commerce Clause as the primary safeguard against state protectionism.[4]

It is not surprising, then, that our cases have long emphasized the connection between the trade barriers that prompted the call for a new Constitution and our dormant Commerce Clause jurisprudence. In *Guy* v. *Baltimore*, 100 U. S. 434, 440 (1880), for example, the Court wrote that state protectionist measures, "if maintained by this court, would ultimately bring our commerce to that 'oppressed and degraded state,' existing at the adoption of the present Constitution, when the helpless, inadequate Confederation

——————

[4] Before *Woodruff*, there was authority suggesting that the Import-Export Clause applied to trade between States. See *Brown* v. *Maryland*, 12 Wheat. 419, 449 (1827) (Marshall, C. J.); *Almy* v. *California*, 24 How. 169 (1861). And more recently *Woodruff* has been questioned. See *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 624–636 (1997) (THOMAS, J., dissenting). But one way or the other, it would grossly distort the Constitution to hold that it provides no protection against a broad swath of state protectionist measures. Even at the time of the adoption of the Constitution, it would have been asking a lot to require that Congress pass a law striking down every protectionist measure that a State or unit of local government chose to enact. Cf. Friedman & Deacon, A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause, 97 Va. L. Rev. 1877, 1898–1903 (2011); 3 The Records of the Federal Convention of 1787, p. 549 (M. Farrand ed. 1911) (the Virginia Plan's proposal of a congressional negative was "justly abandoned, as, apart from other objections, it was not practicable among so many States, increasing in number, and enacting, each of them, so many laws").

was abandoned and the national government instituted." More recently, we observed that our dormant Commerce Clause cases reflect a "'central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Granholm*, 544 U. S., at 472 (quoting *Hughes* v. *Oklahoma*, 441 U. S. 322, 325–326 (1979)).

In light of this history and our established case law, we reiterate that the Commerce Clause by its own force restricts state protectionism.

## B

Under our dormant Commerce Clause cases, if a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to "'advanc[e] a legitimate local purpose.'" *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 338 (2008). See also, *e.g.*, *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 100–101 (1994); *Maine* v. *Taylor*, 477 U. S. 131, 138 (1986).

Tennessee's 2-year durational-residency requirement plainly favors Tennesseans over nonresidents, and neither the Association nor the dissent below defends that requirement under the standard that would be triggered if the requirement applied to a person wishing to operate a retail store that sells a commodity other than alcohol. See 883 F. 3d, at 626. Instead, their arguments are based on §2 of the Twenty-first Amendment, to which we will now turn.

## III
### A

Section 2 of the Twenty-first Amendment provides as follows:

> "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

Although the interpretation of any provision of the Constitution must begin with a consideration of the literal meaning of that particular provision, reading §2 to prohibit the transportation or importation of alcoholic beverages in violation of *any* state law[5] would lead to absurd results that the provision cannot have been meant to produce. Under the established rule that a later adopted provision takes precedence over an earlier, conflicting provision of equal stature, see, *e.g.*, *United States* v. *Tynen*, 11 Wall. 88, 92 (1871); *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936); A. Scalia & B. Garner, Reading Law 327–328 (2012); 1A N. Singer & J. Singer, Sutherland on Statutory Construction §23:9 (7th ed. 2009), such a reading of §2 would mean that the provision would trump any irreconcilable provision of the original Constitution, the Bill of Rights, the Fourteenth Amendment, and every other constitutional provision predating ratification of the Twenty-first Amendment in 1933. This would mean, among other things, that a state law prohibiting the im-

—————

[5] As we will explain, §2 followed the wording of the 1913 Webb-Kenyon Act, ch. 90, 37 Stat. 699, see *Craig* v. *Boren*, 429 U. S. 190, 205–206 (1976), and, given this Court's case law at the time, it went without saying that the only state laws that Congress could protect from constitutional challenge were those that represented the valid exercise of the police power, which was not understood to authorize purely protectionist measures with no bona fide relation to public health or safety. See *infra*, at 14–15, 18–19.

portation of alcohol for sale to persons of a particular race, religion, or sex would be immunized from challenge under the Equal Protection Clause. Similarly, if a state law prohibited the importation of alcohol for sale by proprietors who had expressed an unpopular point of view on an important public issue, the First Amendment would provide no protection. If a State imposed a duty on the importation of foreign wine or spirits, the Import-Export Clause would have to give way. If a state law retroactively made it a crime to have bought or sold imported alcohol under specified conditions, the *Ex Post Facto* Clause would provide no barrier to conviction. The list goes on.

Despite the ostensibly broad text of §2, no one now contends that the provision must be interpreted in this way. Instead, we have held that §2 must be viewed as one part of a unified constitutional scheme. See *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 109 (1980); *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324, 331–332 (1964); cf. Scalia & Garner, *supra*, at 167–169, 180–182. In attempting to understand how §2 and other constitutional provisions work together, we have looked to history for guidance, and history has taught us that the thrust of §2 is to "constitutionaliz[e]" the basic structure of federal-state alcohol regulatory authority that prevailed prior to the adoption of the Eighteenth Amendment. *Craig* v. *Boren*, 429 U. S. 190, 206 (1976). We therefore examine that history.

## B

Throughout the 19th century, social problems attributed to alcohol use prompted waves of state regulation, and these measures were often challenged as violations of various provisions of the Federal Constitution.

One wave of state regulation occurred during the first half of the century. The country's early years were a time of notoriously hard drinking, see D. Okrent, Last Call: The

Rise and Fall of Prohibition 7 (2010),[6] and the problems that this engendered prompted States to enact a variety of regulations, including licensing requirements, age restrictions, and Sunday-closing laws. See Byse, Alcoholic Beverage Control Before Repeal, 7 Law & Contemp. Prob. 544, 546–551 (1940).

Three States' alcohol licensing laws came before this Court in 1847 in the *License Cases*, 5 How. 504. The principal claim in those cases was similar to the one now before us; licensing laws enacted in three States were challenged under the Commerce Clause. The Court unanimously rejected those claims, but six Justices authored opinions; no opinion commanded a majority; and the general status of dormant Commerce Clause claims was left uncertain. See 5 C. Swisher, The Taney Period, 1836–64, History of the Supreme Court of the United States 373–374 (1974).

Following the Civil War, the Court considered a steady stream of alcohol-regulation cases. The postwar period saw a great proliferation of saloons,[7] and myriad social

——————

[6] Between 1780 and 1830, Americans consumed "more alcohol, on an individual basis, than at any other time in the history of the nation," with per capita consumption double that of the modern era. R. Mendelson, From Demon to Darling: A Legal History of Wine in America 11 (2009).

[7] By 1872, about 100,000 had sprung up across the country, and by the end of the century, that number had climbed to almost 300,000. *Id.*, at 31. This increase has been linked to the introduction of the English "tied-house" system. Under the tied-house system, an alcohol producer, usually a brewer, would set up saloonkeepers, providing them with premises and equipment, and the saloonkeepers, in exchange, agreed to sell only that producer's products and to meet set sales requirements. *Ibid.*; T. Pegram, Battling Demon Rum: The Struggle for a Dry America, 1800–1933, p. 95 (1998). To meet those requirements, saloonkeepers often encouraged irresponsible drinking. *Id.*, at 97. The three-tiered distribution model was adopted by States at least in large part to preclude this system. See *Arnold's Wines, Inc.* v. *Boyle*, 571 F. 3d 185, 187 (CA2 2009).

problems were attributed to this development. In response, many States passed laws restricting the sale of alcohol. By 1891, six States had banned alcohol production and sale completely. R. Hamm, Shaping the Eighteenth Amendment 25 (1995) (Hamm).

During this period, state laws regulating the alcohol trade were unsuccessfully challenged in this Court on a variety of constitutional grounds. See, *e.g.*, *Mugler* v. *Kansas*, 123 U. S. 623 (1887) (Privileges or Immunities and Due Process Clauses of Fourteenth Amendment); *Beer Co.* v. *Massachusetts*, 97 U. S. 25 (1878) (Contracts Clause); *Bartemeyer* v. *Iowa*, 18 Wall. 129 (1874) (Privileges or Immunities and Due Process Clauses of Fourteenth Amendment). In those decisions, the Court staunchly affirmed the "right of the States," in exercising their "police power," to "protect the health, morals, and safety of their people," but the Court also cautioned that this objective could be pursued only "by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the Constitution of the United States." *Mugler*, 123 U. S., at 659. For that reason, the Court continued, "mere pretences" could not sustain a law regulating alcohol; rather, if "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id.*, at 661.

Dormant Commerce Clause challenges also reached the Court. States that banned the production and sale of alcohol within their borders found that these laws did not stop residents from consuming alcohol shipped in from other States. To curb that traffic, States passed laws regulating or prohibiting the importation of alcohol, and these enactments were quickly challenged.

Opinion of the Court

By the late 19th century, the Court was firmly of the view that the Commerce Clause by its own force restricts state regulation of interstate commerce. See *Bowman* v. *Chicago & Northwestern R. Co.*, 125 U. S. 465 (1888); *Leisy* v. *Hardin*, 135 U. S. 100 (1890). Dormant Commerce Clause cases from that era "advanced two distinct principles," an understanding of which is critical to gauging the States' pre-Prohibition power to regulate alcohol. *Granholm*, 544 U. S., at 476.

First, the Court held that the Commerce Clause prevented States from discriminating "against the citizens and products of other States," *Walling* v. *Michigan*, 116 U. S. 446, 460 (1886). See also *Scott* v. *Donald*, 165 U. S. 58 (1897); *Tiernan* v. *Rinker*, 102 U. S. 123 (1880). Applying that rule, the *Walling* Court struck down a discriminatory state fee that applied only to those in the business of selling imported alcohol. 116 U. S., at 454, 458. Similarly, in *Scott*, the Court invalidated a law that gave an "unjust preference [to] the products of the enacting State as against similar products of the other States." 165 U. S., at 101. The Court did not question the States' use of the police power to regulate the alcohol trade but stressed that such regulation must have a "*bona fide*" relation to protecting "'the public health, the public morals or the public safety,'" *id.,* at 91 (quoting *Mugler, supra,* at 661), and could not encroach upon Congress's "power to regulate commerce among the several States," *Walling, supra,* at 458.

Second, the Court "held that the Commerce Clause prevented States from passing facially neutral laws that placed an impermissible burden on interstate commerce." *Granholm*, 544 U. S., at 477. At the time of these decisions, the "original-package doctrine" defined the outer limits of Congress's authority to regulate interstate commerce. *Ibid.* See *Brown* v. *Maryland*, 12 Wheat. 419 (1827). Under that doctrine, "goods shipped in interstate

commerce were immune from state regulation while in their original package," because at that point they had not yet been comingled with the mass of domestic property subject to state jurisdiction. *Granholm*, 544 U. S., at 477; see *id.,* at 477–478 (citing *Vance* v. *W. A. Vandercook Co.*, 170 U. S. 438, 444–445 (1898)). Applying this doctrine to state alcohol laws, the Court struck down an Iowa statute that required importers to obtain special certificates, *Bowman*, *supra*, as well as another Iowa law that, with limited exceptions, banned the importation of liquor, *Leisy*, *supra*.

These decisions left dry States "in a bind." *Granholm*, *supra*, at 478. See Rogers, Interstate Commerce in Intoxicating Liquors Before the Webb-Kenyon Act, 4 Va. L. Rev. 174 (1916), 288 (1917) (noting "practical nullification of state laws" by original-package decisions). States could ban the production and sale of alcohol within their borders, but those bans "were ineffective because out-of-state liquor was immune from any state regulation as long as it remained in its original package." *Granholm, supra*, at 478. In effect, the Court's interpretation of the dormant Commerce Clause conferred favored status on out-of-state alcohol, and that hamstrung the dry States' efforts to enforce local prohibition laws. Representatives of those States and temperance advocates thus turned to Congress, which passed two laws to solve the problem.

The first of these was the Wilson Act, enacted in 1890. Ch. 728, 26 Stat. 313, 27 U. S. C. §121. Named for Senator James F. Wilson of Iowa, whose home State's laws had fallen in *Bowman* and *Leisy*, the Wilson Act aimed to obviate the problem presented by the "original-package" rule. Dormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue, cf. *Bowman*, *supra,* at 485; *Leisy*, *supra,* at 123–124, and the strategy of those who favored the Wilson Act was for Congress to eliminate

the problem that had surfaced in *Bowman* and *Leisy* by regulating the interstate shipment of alcohol, see Hamm 77–80; Rogers, *supra*, at 194–195.  During the late 19th century and early 20th century, Congress enacted laws that entirely prohibited the transportation of certain goods and persons across state lines, and some but not all of these measures were held to be valid exercises of the commerce power.  See *Lottery Case*, 188 U. S. 321 (1903) (upholding law prohibiting interstate shipment of lottery tickets); *Hoke* v. *United States*, 227 U. S. 308 (1913) (sustaining Mann Act prohibition on bringing women across state lines for prostitution); *Hammer* v. *Dagenhart*, 247 U. S. 251 (1918) (striking down provision banning interstate shipment of goods produced by child labor).

Unlike these laws, the Wilson Act did not attempt to ban all interstate shipment of alcohol.  Its goal was more modest: to leave it up to each State to decide whether to admit alcohol.  Its critical provision specified that all alcoholic beverages "transported into any State or Territory" were subject "upon arrival" to the same restrictions imposed by the State "in the exercise of its police powers" over alcohol produced in the State.[8]  Thus, the Wilson Act mandated equal treatment for alcohol produced within and outside a State, not favorable treatment for local products.  See *Granholm, supra*, at 479 (discussing *Scott*, 165 U. S., at 100–101).  And the only state laws that it attempted to shield were those enacted by a State "in the

_____

[8] The provision read as follows:

"That all fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."  Ch. 728, 26 Stat. 313, 27 U. S. C. §121.

exercise of its police powers," which, as we have seen, applied only to bona fide health and safety measures. See, *e.g.*, *id.*, at 91 (citing *Mugler*, 123 U. S., at 661).

Despite Congress's clear aim, the Wilson Act failed to relieve the dry States' predicament. In *Rhodes* v. *Iowa*, 170 U. S. 412 (1898), and *Vance* v. *W. A. Vandercook Co.*, *supra*, the Court read the Act's reference to the "arrival" of alcohol in a State to mean delivery to the consignee, not arrival within the State's borders. *Granholm*, 544 U. S., at 480. The upshot was that residents of dry States could continue to order and receive imported alcohol. *Ibid.* See also Hamm 178. In 1913, Congress tried to patch this hole by passing the Webb-Kenyon Act, ch. 90, 37 Stat. 699, 27 U. S. C. §122.

The aim of the Webb-Kenyon Act was to give each State a measure of regulatory authority over the importation of alcohol, but this created a drafting problem. There were those who thought that a federal law giving the States this authority would amount to an unconstitutional delegation of Congress's legislative power over interstate commerce.[9] So the Act was framed not as a measure conferring power on the States but as one prohibiting conduct that violated state law. The Act provided that the shipment of alcohol into a State for use in any manner, "either in the original package or otherwise," "in violation of any law of such State," was prohibited.[10] This formulation is significant

––––––––

[9] That was the position expressed in an opinion issued by Attorney General Wickersham, 30 Op. Atty. Gen. 88 (1913), and President Taft's veto, which Congress overrode, was based on exactly this ground. 49 Cong. Rec. 4291 (1913) (Veto Message of the President).

[10] The Act provided:

"That the shipment or transportation . . . of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State . . . into any other State . . . which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law

for present purposes because it would provide a model for §2 of the Twenty-first Amendment.

The Webb-Kenyon Act attempted to fix the hole in the Wilson Act and thus to "eliminate the regulatory advantage . . . afforded imported liquor," *Granholm*, *supra*, at 482; see also *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311, 324 (1917), but its wording, unlike the Wilson Act's, did not explicitly mandate equal treatment for imported and domestically produced alcohol. And it referred to "*any* law of such State," 37 Stat. 700 (emphasis added), whereas the Wilson Act referred to "the laws of such State or Territory *enacted in the exercise of its police powers.*" 26 Stat. 313 (emphasis added). But despite these differences, *Granholm* held, over a strenuous dissent, 544 U. S., at 505–514 (opinion of THOMAS, J.), that the Webb-Kenyon Act did not purport to authorize States to enact protectionist measures.

There is good reason for this holding. As we have noted, the Court's pre-Webb-Kenyon Act decisions upholding state liquor laws against challenges based on constitutional provisions other than the Commerce Clause had cautioned that protectionist laws disguised as exercises of the police power would not escape scrutiny. See *supra,* at 14–15.[11] The Webb-Kenyon Act, by regulating commerce, could obviate dormant Commerce Clause problems, but it could not override the limitations imposed by these other constitutional provisions and the traditional understanding regarding the bounds of the States' inherent police powers. Therefore the Wilson Act's reference to laws "enacted in the exercise of [a State's] police powers," 26 Stat. 313, merely restated what this Court had already

––––––––––

of such State . . . is hereby prohibited." 37 Stat. 699–700.

[11] This principle was also invoked in dormant Commerce Clause cases involving other products. See, *e.g.*, *Minnesota* v. *Barber*, 136 U. S. 313, 319, 323 (1890); *Railroad Co.* v. *Husen*, 95 U. S. 465, 472 (1878).

found to be a constitutional necessity, and consequently, there was no need to include such language in the Webb-Kenyon Act. Even without limiting language like that in the Wilson Act, the shelter given by the Webb-Kenyon Act applied only where "the States treated in-state and out-of-state liquor on the same terms." *Granholm*, *supra*, at 481.[12]

Following passage of the Webb-Kenyon Act, temperance advocates began the final push for nationwide Prohibition, and with the ratification of the Eighteenth Amendment in 1919, their goal was achieved. The manufacture, sale, transportation, and importation of alcoholic beverages anywhere in the country were prohibited.

## IV
## A

By 1933, support for Prohibition had substantially diminished but not vanished completely. Thirty-eight state conventions eventually ratified the Twenty-first Amendment, but 10 States either rejected or took no action on the Amendment. Section 1 of the Twenty-first Amendment repealed the Eighteenth Amendment and thus ended nationwide Prohibition, but §2, the provision at issue here, gave each State the option of banning alcohol if its citizens so chose.

————————

[12]Lower court decisions issued between the enactment of the Webb-Kenyon Act and the ratification of the Eighteenth Amendment interpreted the Act this way. See *Evansville Brewing Assn.* v. *Excise Comm'n of Jefferson Cty., Ala.*, 225 F. 204 (ND Ala. 1915); *Southern Express Co.* v. *Whittle*, 194 Ala. 406, 69 So. 652 (1915); *Brennen* v. *Southern Express Co.*, 106 S. C. 102, 90 S. E. 402 (1916); *Charleston & W. C. R. Co.* v. *Gosnell*, 106 S. C. 84, 90 S. E. 264 (1916) (Hydrick, J., concurring); *Monumental Brewing Co.* v. *Whitlock*, 111 S. C. 198, 97 S. E. 56 (1918). See also *Pacific Fruit & Produce Co.* v. *Martin*, 16 F. Supp. 34, 39–40 (WD Wash. 1936); Friedman, Constitutional Law: State Regulation of Importation of Intoxicating Liquor Under Twenty-first Amendment, 21 Cornell L. Q. 504, 509 (1936).

As we have previously noted, the text of §2 "closely follow[ed]" the operative language of the Webb-Kenyon Act, and this naturally suggests that §2 was meant to have a similar meaning. *Craig*, 429 U. S., at 205–206. The decision to follow that unusual formulation is especially revealing since the drafters of §2, unlike those who framed the Webb-Kenyon Act, had no need to worry that a more straightforward wording might trigger a constitutional challenge. Accordingly, we have inferred that §2 was meant to "constitutionaliz[e]" the basic understanding of the extent of the States' power to regulate alcohol that prevailed before Prohibition. *Id.,* at 206. See also *Granholm*, *supra,* at 484. And as recognized during that period, the Commerce Clause did not permit the States to impose protectionist measures clothed as police-power regulations. See *supra*, at 14–15. See also, *e.g.*, *Railroad Co.* v. *Husen*, 95 U. S. 465, 472 (1878) (a State "may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or inter-state commerce").

This understanding is supported by the debates on the Amendment in Congress[13] and the state ratifying conventions. The records of the state conventions provide no evidence that §2 was understood to give States the power to enact protectionist laws,[14] "a privilege [the States] had

———————

[13] See, *e.g.*, 76 Cong. Rec. 4172 (1933) (statement of Sen. Borah) (§2 of Twenty-first Amendment would "incorporat[e] [Webb-Kenyon] permanently in the Constitution of the United States"); *id.*, at 4168 (statement of Sen. Fess) ("[T]he second section of the joint resolution . . . is designed to permit the Federal authority to assist the States that want to be dry to remain dry"); *id.*, at 4518 (statement of Rep. Robinson) ("Section 2 attempts to protect dry states").

[14] See Nielson, No More "Cherry-Picking": The Real History of the 21st Amendment's §2, 28 Harv. J. L. & Pub. Pol'y 281, 286, n. 21 (2004). See generally E. Brown, Ratification of the Twenty-first Amendment to the Constitution of the United States; State Convention Records and Laws (1938).

not enjoyed at any earlier time.” *Granholm*, *supra*, at 485.

## B

Although our later cases have recognized that §2 cannot be given an interpretation that overrides all previously adopted constitutional provisions, the Court’s earliest cases interpreting §2 seemed to feint in that direction. In 1936, the Court found that §2’s text was “clear” and saw no need to consider whether history supported a more modest interpretation, *State Bd. of Equalization of Cal.* v. *Young’s Market Co.*, 299 U. S. 59, 63–64 (1936)—an approach even the dissent rejects, see *infra*, at 24, n. 16; *post*, at 2.[15] The Court read §2 as granting each State plenary “power to forbid all importations which do not comply with the conditions which it prescribes,” *Young’s Market*, *supra*, at 62; see also *Ziffrin, Inc.* v. *Reeves*, 308 U. S. 132, 138–139 (1939), including laws that discrimi-

---

[15] The dissent characterizes the Court as a “committee of nine” that has “stray[ed] from the text” of the Twenty-first Amendment and “impose[d] [its] own free-trade rules” on the States. *Post,* at 8, 15 (opinion of J. GORSUCH). This is empty rhetoric. The dissent itself strays from a blinkered reading of the Amendment. The dissent interprets §2 of the Amendment to mean more than it literally says, arguing that §2 covers the residency requirements at issue even though they are not tied in any way to what the Amendment actually addresses, namely, “the transportation or importation” of alcohol across state lines. See *post,* at 2, n. 1. And the dissent agrees that §2 cannot be read as broadly as one might think if its language were read in isolation and not as part of an integrated constitutional scheme. See *post,* at 2. The dissent asserts that §2 does not abrogate all previously adopted constitutional provisions, just the dormant Commerce Clause. But the dissent does not say whether it thinks §2 allows the States to adopt alcohol regulations that serve no conceivable purpose other than protectionism. Even the dissent below did not go that far. See n. 18, *infra*. If §2 gives the States *carte blanche* to engage in protectionism, we suppose that Tennessee could restrict licenses to persons who can show that their lineal ancestors have lived in the State since 1796 when the State entered the Union. Does the dissent really think that this is what §2 was meant to permit?

nated against out-of-state products.   See, *e.g., Young's Market, supra*, at 62; *Mahoney* v. *Joseph Triner Corp.*, 304 U. S. 401, 403 (1938); *Indianapolis Brewing Co.* v. *Liquor Control Comm'n*, 305 U. S. 391, 394 (1939).   The Court went so far as to assume that the Fourteenth Amendment imposed no barrier to state legislation in the field of alcohol regulation.   See *Young's Market*, *supra,* at 64 ("A classification recognized by the Twenty-first Amendment cannot be deemed forbidden by the Fourteenth").

With subsequent cases, however, the Court saw that §2 cannot be read that way, and it therefore scrutinized state alcohol laws for compliance with many constitutional provisions.   See, *e.g.*, *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484 (1996) (Free Speech Clause); *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116 (1982) (Establishment Clause); *Craig* v. *Boren*, *supra* (Equal Protection Clause); *Wisconsin* v. *Constantineau*, 400 U. S. 433 (1971) (Due Process Clause); *Department of Revenue* v. *James B. Beam Distilling Co.*, 377 U. S. 341 (1964) (Import-Export Clause).

The Court also held that §2 does not entirely supersede Congress's power to regulate commerce.   Instead, after evaluating competing federal and state interests, the Court has ruled against state alcohol laws that conflicted with federal regulation of the export of alcohol, *Hostetter*, 377 U. S., at 333–334, federal antitrust law, *Midcal Aluminum,* 445 U. S., at 110–111, 113–114; *324 Liquor Corp.* v. *Duffy*, 479 U. S. 335, 346–347, 350–351 (1987), and federal regulation of the airwaves, *Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691, 713, 716 (1984).

As for the dormant Commerce Clause, the developments leading to the adoption of the Twenty-first Amendment have convinced us that the aim of §2 was not to give States a free hand to restrict the importation of alcohol for purely protectionist purposes.   See *Granholm*, *supra,* at 486–487; *Bacchus*, 468 U. S., at 276.

C

Although some Justices have argued that §2 shields all state alcohol regulation—including discriminatory laws—from any application of dormant Commerce Clause doctrine,[16] the Court's modern §2 precedents have repeatedly rejected that view. We have examined whether state alcohol laws that burden interstate commerce serve a State's legitimate §2 interests. And protectionism, we have stressed, is not such an interest. *Ibid.*

Applying that principle, we have invalidated state alcohol laws aimed at giving a competitive advantage to in-state businesses. The Court's decision in *Bacchus* "provides a particularly telling example." *Granholm*, *supra*, at 487. There, the Court was confronted with a tax exemption that favored certain in-state alcohol producers. In defending the law, the State argued that even if the discriminatory exemption violated "ordinary Commerce Clause principles, it [was] saved by the Twenty-first Amendment." *Bacchus*, 468 U. S., at 274. We rejected that argument and held instead that the relevant question was "whether the principles underlying the Twenty-first Amendment are sufficiently implicated by the [discrimina-

──────────

[16] See, *e.g., Granholm* v. *Heald*, 544 U. S. 460, 497–498 (2005) (THOMAS, J., dissenting); *Healy* v. *Beer Institute*, 491 U. S. 324, 349 (1989) (Rehnquist, C. J., dissenting); *324 Liquor Corp.* v. *Duffy*, 479 U. S. 335, 352–353 (1987) (O'Connor, J., dissenting); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 281–282 (1984) (Stevens, J., dissenting).

The dissent rehashes this debate, see *post*, at 5–8, 14, asserting that the Webb-Kenyon Act, and thus §2, were "understood" to repudiate not only the original-package cases, but also the antidiscrimination rule articulated in cases including *Scott* v. *Donald*, 165 U. S. 58 (1897). But this Court's modern §2 decisions—not simply the lower court decisions at which the dissent takes aim, see *post*, at 6, n. 3—establish that those enactments, though no doubt aimed at granting States additional "discretion to calibrate alcohol regulations to local preferences," *post*, at 2, did not exempt States from "the nondiscrimination principle of the Commerce Clause." *Granholm*, *supra*, at 487.

tory] exemption . . . to outweigh the Commerce Clause principles that would otherwise be offended." *Id.,* at 275. Ultimately, we held that §2 did not save the disputed tax because it clearly aimed "'to promote a local industry'" rather than "to promote temperance or to carry out any other purpose of the Twenty-first Amendment." *Id.,* at 276.

The same went for the state law in *Healy* v. *Beer Institute*, 491 U. S. 324 (1989), which required out-of-state shippers of beer to affirm that their wholesale price for products sold in Connecticut was no higher than the prices they charged to wholesalers in bordering States. Connecticut argued that the "Twenty-first Amendment sanction[ed]" this law "regardless of its effect on interstate commerce," *id.,* at 341, but we held that the law violated the Commerce Clause, noting that it "discriminate[d] against brewers and shippers of beer engaged in interstate commerce" without justification "by a valid factor unrelated to economic protectionism," *id.,* at 340–341.[17]

Most recently, in *Granholm*, we struck down a set of discriminatory direct-shipment laws that favored in-state wineries over out-of-state competitors. After surveying the history of §2, we affirmed that "the Twenty-first Amendment does not immunize all laws from Commerce Clause challenge." 544 U. S., at 488. We therefore examined whether the challenged laws were reasonably necessary to protect the States' asserted interests in policing underage drinking and facilitating tax collection. *Id.,* at 489–493. Concluding that the answer to that question was no, we invalidated the laws as inconsistent with the

———————

[17]Justice Scalia, for his part, thought the "statute's invalidity [was] fully established by its facial discrimination against interstate commerce"—discrimination that in his view "eliminate[d] the immunity afforded by the Twenty-first Amendment." *Healy, supra,* at 344 (opinion concurring in part and concurring in judgment) (citing *Bacchus, supra,* at 275–276).

dormant Commerce Clause's nondiscrimination principle. *Id.,* at 492–493.

To summarize, the Court has acknowledged that §2 grants States latitude with respect to the regulation of alcohol, but the Court has repeatedly declined to read §2 as allowing the States to violate the "nondiscrimination principle" that was a central feature of the regulatory regime that the provision was meant to constitutionalize. *Id.*, at 487.

### D

The Association resists this reading. Although it concedes (as it must under *Granholm*) that §2 does not give the States the power to discriminate against out-of-state alcohol *products and producers*, the Association presses the argument, echoed by the dissent, that a different rule applies to state laws that regulate in-state alcohol distribution. There is no sound basis for this distinction.[18]

### 1

The Association's argument encounters a problem at the outset. The argument concedes that §2 does not shield state laws that discriminate against interstate commerce with respect to the very activity that the provision explicitly addresses—the importation of alcohol. But at the same time, the Association claims that §2 protects something that §2's text, if read literally, does not cover—laws restricting the licensing of domestic retail alcohol stores. That reading is implausible. Surely if §2 granted States the power to discriminate in the field of alcohol regulation,

---

[18] The Association's argument is more extreme than that of the dissent below, which recognized that in-state distribution laws that "serve no purpose besides 'economic protectionism'" remain subject to dormant Commerce Clause scrutiny. *Byrd* v. *Tennessee Wine and Spirits Retailers Assn.*, 883 F. 3d 608, 633 (CA6 2018) (Sutton, J., concurring in part and dissenting in part) (quoting *Bacchus*, *supra*, at 276).

that power would be at its apex when it comes to regulating the activity to which the provision expressly refers.

The Association and the dissent point out that *Granholm* repeatedly spoke of discrimination against out-of-state products and producers, but there is an obvious explanation: The state laws at issue in *Granholm* discriminated against out-of-state producers. See 883 F. 3d, at 621. And *Granholm* never said that its reading of history or its Commerce Clause analysis was limited to discrimination against products or producers. On the contrary, the Court stated that the Clause prohibits state discrimination against all "'out-of-state economic *interests*,'" *Granholm*, 544 U. S., at 472 (emphasis added), and noted that the direct-shipment laws in question "contradict[ed]" dormant Commerce Clause principles because they "deprive[d] *citizens* of their right to have access to the markets of other States on equal terms." *Id.,* at 473 (emphasis added). *Granholm* also described its analysis as consistent with the rule set forth in *Bacchus*, *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573 (1986), and *Healy* that "'[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic *interests* over out-of-state *interests*, we have generally struck down the statute without further inquiry.'" *Granholm*, *supra*, at 487 (quoting *Brown-Forman*, *supra*, at 579; emphasis added).

The Association counters that even if the *Granholm* Court did not explicitly limit its holding to products and producers, the Court implicitly did so when it rejected the argument that its analysis would call into question the constitutionality of state laws setting up three-tiered alcohol distribution systems. See *Granholm*, *supra,* at 488–489. This argument, which the dissent also advances, see *post*, at 12–13, reads far too much into *Granholm*'s discussion of the three-tiered model. Although *Granholm*

spoke approvingly of that basic model, it did not suggest that §2 sanctions every discriminatory feature that a State may incorporate into its three-tiered scheme. At issue in the present case is not the basic three-tiered model of separating producers, wholesalers, and retailers, but the durational-residency requirement that Tennessee has chosen to impose on new applicants for liquor store licenses. Such a requirement is not an essential feature of a three-tiered scheme. Many such schemes do not impose durational-residency requirements—or indeed any residency requirements—on individual or corporate liquor store owners. See, *e.g.,* Brief for State of Illinois et al. as *Amici Curiae* 24–25, 27 (identifying States that have either "dispos[ed] with the durational aspect of the [residency] requirement" or "d[o] not regulate the residency of the applicant corporation or partnership"). Other three-tiered schemes differ in other ways. See, *e.g., id.,* at 24–28 (noting variations); FTC, Possible Anticompetitive Barriers to E-Commerce: Wine 7–9 (July 2003), https:// www.ftc.gov/sites/default/files/documents/reports/possible -anticompetitive-barriers-e-commerce-wine/winereport2_0. pdf (as last visited June 24, 2019) (same). Because we agree with the dissent that, under §2, States "remai[n] free to pursue" their legitimate interests in regulating the health and safety risks posed by the alcohol trade, *post*, at 12, each variation must be judged based on its own features.

2

In support of the argument that the Tennessee scheme is constitutional, the Association and its *amici* claim that discriminatory distribution laws, including in-state presence and residency requirements, long predate Prohibition and were adopted by many States following ratification of

the Twenty-first Amendment.[19]　 Indeed, the Association notes that the 2-year durational-residency requirement now before us dates back to 1939 and is consistent with durational-residency regimes adopted by several other States around the same time.[20]　 According to the Association, that history confirms that §2 was intended to broadly exempt all in-state distribution laws from dormant Commerce Clause scrutiny.　 The dissent relies heavily on this same argument.

This argument fails for several reasons.　 Insofar as it relies on state laws enacted shortly after the ratification of the Twenty-first Amendment and this Court's early decisions interpreting it, the Association and the dissent's argument does not take into account the overly expansive interpretation of §2 that took hold for a time in the immediate aftermath of its adoption.　 See *supra,* at 22–23. Thus, some state laws adopted soon after the ratification of the Twenty-first Amendment may have been based on an understanding of §2 that can no longer be defended.　 It is telling that an argument similar to the one now made by the Association would have dictated a contrary result in *Granholm,* since state laws disfavoring imported products were passed during this same period.　 See, *e.g.*, *Young's Market Co.*, 299 U. S., at 62 (discriminatory license fee on imported beer); *Mahoney,* 304 U. S., at 403 (prohibition on import of certain liquors); *Indianapolis Brewing Co.,* 305

—————

[19] See *Granholm*, 544 U. S., at 518, and n. 6 (THOMAS, J., dissenting) (licensing schemes adopted by three-tier States following ratification of Twenty-first Amendment discriminated "by requiring in-state residency or physical presence as a condition of obtaining licenses") (collecting statutes); Brief for Petitioner 33–34 (collecting residency-requirement statutes).　 See also Brief for State of Illinois et al. as *Amici Curiae* 7–8 (referencing 19th-century state statutes that required "retailers to reside in-state or to maintain an in-state presence").

[20] See 1939 Tenn. Pub. Acts, ch. 49, §§5–8; Brief for Petitioner 34 (collecting durational-residency requirement statutes); Brief for State of Illinois et al. as *Amici Curiae* 24 (same).

U. S., at 394 (same). But our later cases have rejected this interpretation of §2. See *Granholm, supra,* at 487.

Insofar as the Association's argument is based on state laws adopted prior to Prohibition, it infers too much from the existence of laws that were never tested in this Court. Had they been tested here, there is no reason to conclude that they would have been sustained. During that time, the Court repeatedly invalidated, on dormant Commerce Clause grounds, a variety of state and local efforts to license those engaged in interstate business,[21] and as noted, pre-Prohibition decisions of this Court and the lower courts held that state alcohol laws that discriminated against interstate commerce were unconstitutional, see *supra,* at 15.

Contrary to the Association's contention, not all of these

---

[21] *Real Silk Hosiery Mills* v. *Portland,* 268 U. S. 325, 335–336 (1925) (license tax on solicitors of orders to be filled by an out-of-state manufacturer); *Shafer* v. *Farmers Grain Co. of Embden,* 268 U. S. 189, 197–201 (1925) (license requirement for the purchase of grain shipped immediately out of the State); *Stewart* v. *Michigan,* 232 U. S. 665, 669–670 (1914) (state law requiring a license for catalog sales); *Crenshaw* v. *Arkansas,* 227 U. S. 389, 399–401 (1913) (state law requiring a foreign corporation actively soliciting sales in State to obtain a license); *Dozier* v. *Alabama,* 218 U. S. 124, 127–128 (1910) (licensing requirement on the solicitors of photography enlargement services and frames manufactured out of State); *International Textbook Co.* v. *Pigg,* 217 U. S. 91, 107–111 (1910) (state law requiring an out-of-state educational publishing company to pay a license fee for exchanging materials with customers); *Rearick* v. *Pennsylvania,* 203 U. S. 507, 510–511 (1906) (ordinance requiring license to solicit orders for out-of-state goods); *Norfolk & Western R. Co.* v. *Sims,* 191 U. S. 441, 449–451 (1903) (state licensing requirement on express company acting as agent for importer of a sewing machine); *Brennan* v. *Titusville,* 153 U. S. 289, 306–308 (1894) (licensing tax on persons engaged in trade on behalf of firms doing business outside the State); *Corson* v. *Maryland,* 120 U. S. 502, 505–506 (1887) (state licensing requirement as applied to agent of out-of-state firm soliciting sales); *Welton* v. *Missouri,* 91 U. S. 275, 278, 282–283 (1876) (state law requiring payment of license tax by sellers of out-of-state goods).

decisions involved discrimination against alcohol produced out of State or alcohol importers. The tax in *Walling*, for example, applied to those engaged in the business of selling imported alcohol within the State. 116 U. S. 446. And in concluding that the law violated the Commerce Clause, the Court affirmed that, without the dormant Commerce Clause, there would "be no security against conflicting regulations of different states, each discriminating in favor of its own products *and citizens*, and against the products *and citizens* of other states." *Id.,* at 456–457 (emphasis added). So too, the dispensary law in *Scott* was challenged on the ground that it discriminated "against products of other States *and against citizens* of other States." 165 U. S., at 62 (emphasis added); see also *id.,* at 94.

Nor have States historically enjoyed absolute authority to police alcohol within their borders. As discussed earlier, far from granting the States plenary authority to adopt domestic regulations, the Court's police-power precedents required an examination of the actual purpose and effect of a challenged law. See, *e.g.*, *Mugler*, 123 U. S., at 661 ("It does not at all follow that every statute enacted ostensibly for the promotion" of "the public health, the public morals, or the public safety" is "to be accepted as a legitimate exertion of the police powers of the State"); see also *Husen*, 95 U. S., at 472; *Welton* v. *Missouri*, 91 U. S. 275, 278 (1876). Cf. H. Black, Intoxicating Liquors §30, p. 40 (1892) (stating that certain 19th-century licensing and residency requirements were valid because their "purpose and effect" was to prevent "the unlawful selling of liquors, *and not to discriminate against citizens of other states*" (emphasis added)).

For these reasons, we reject the Association's overly broad understanding of §2. That provision allows each State leeway to enact the measures that its citizens believe are appropriate to address the public health and

safety effects of alcohol use and to serve other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests.

V

Having concluded that §2 does not confer limitless authority to regulate the alcohol trade, we now apply the §2 analysis dictated by the provision's history and our precedents.

If we viewed Tennessee's durational-residency requirements as a package, it would be hard to avoid the conclusion that their overall purpose and effect is protectionist. Indeed, two of those requirements—the 10-year residency requirement for license renewal and the provision that shuts out all publicly traded corporations—are so plainly based on unalloyed protectionism that neither the Association nor the State is willing to come to their defense. The provision that the Association and the State seek to preserve—the 2-year residency requirement for initial license applicants—forms part of that scheme. But we assume that it can be severed from its companion provisions, see 883 F. 3d, at 626–628, and we therefore analyze that provision on its own.

Since the 2-year residency requirement discriminates on its face against nonresidents, it could not be sustained if it applied across the board to all those seeking to operate any retail business in the State. Cf. *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383, 391–392 (1994); *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 39 (1980). But because of §2, we engage in a different inquiry. Recognizing that §2 was adopted to give each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens, we ask whether the challenged requirement can be justified as a public health or safety measure or on some other legiti-

mate nonprotectionist ground. Section 2 gives the States regulatory authority that they would not otherwise enjoy, but as we pointed out in *Granholm*, "mere speculation" or "unsupported assertions" are insufficient to sustain a law that would otherwise violate the Commerce Clause. 544 U. S., at 490, 492. Where the predominant effect of a law is protectionism, not the protection of public health or safety, it is not shielded by §2.

The provision at issue here expressly discriminates against nonresidents and has at best a highly attenuated relationship to public health or safety. During the course of this litigation, the Association relied almost entirely on the argument that Tennessee's residency requirements are simply "not subject to Commerce Clause challenge," 259 F. Supp. 3d, at 796, and the State itself mounted no independent defense. As a result, the record is devoid of any "concrete evidence" showing that the 2-year residency requirement actually promotes public health or safety; nor is there evidence that nondiscriminatory alternatives would be insufficient to further those interests. *Granholm*, *supra*, at 490; see 883 F. 3d, at 625–626.

In this Court, the Association has attempted to defend the 2-year residency requirement on public health and safety grounds, but this argument is implausible on its face. The Association claims that the requirement ensures that retailers are "amenable to the direct process of state courts," Brief for Petitioner 48 (internal quotation marks omitted), but the Association does not explain why this objective could not easily be achieved by ready alternatives, such as requiring a nonresident to designate an agent to receive process or to consent to suit in the Tennessee courts. See *Cooper* v. *McBeath*, 11 F. 3d 547, 554 (CA5 1994).

Similarly unpersuasive is the Association's claim that the 2-year requirement gives the State a better opportunity to determine an applicant's fitness to sell alcohol and

guards against "undesirable nonresidents" moving into the State for the purpose of operating a liquor store. Brief for Petitioner 10 (internal quotation marks omitted). The State can thoroughly investigate applicants without requiring them to reside in the State for two years before obtaining a license. Tennessee law already calls for criminal background checks on all applicants, see Tenn. Code Ann. §57–3–208, and more searching checks could be demanded if necessary. As the Fifth Circuit observed in a similar case, "[i]f [the State] desires to scrutinize its applicants thoroughly, as is its right, it can devise nondiscriminatory means short of saddling applicants with the 'burden' of residing" in the State. *Cooper*, 11 F. 3d, at 554.

The 2-year residency requirement, in any event, poorly serves the goal of enabling the State to ensure that only law-abiding and responsible applicants receive licenses. As the Tennessee attorney general explained, if a nonresident moves to the State with the intention of applying for a license once the 2-year period ends, the TABC will not necessarily have any inkling of the future applicant's intentions until that individual applies for a license, and consequently, the TABC will have no reason to begin an investigation until the 2-year period has ended. App. to Brief in Opposition 17a. And all that the 2-year requirement demands is residency. A prospective applicant is not obligated during that time "to be educated about liquor sales, submit to inspections, or report to the State." *Ibid.*

The 2-year residency requirement is not needed to enable the State to maintain oversight over liquor store operators. In *Granholm*, it was argued that the prohibition on the shipment of wine from out-of-state sources was justified because the State could not adequately monitor the activities of nonresident entities. Citing "improvements in technology," we found that argument insufficient. 544 U. S., at 492. See also *Cooper*, *supra*, at 554 ("In this age of split-second communications by means of computer

networks . . . there is no shortage of less burdensome, yet still suitable, options"). In this case, the argument is even less persuasive since the stores at issue are physically located within the State. For that reason, the State can monitor the stores' operations through on-site inspections, audits, and the like. See §57–3–104. Should the State conclude that a retailer has "fail[ed] to comply with state law," it may revoke its operating license. *Granholm*, 544 U. S., at 490. This "provides strong incentives not to sell alcohol" in a way that threatens public health or safety. *Ibid.*

In addition to citing the State's interest in regulatory control, the Association argues that the 2-year residency requirement would promote responsible alcohol consumption. According to the Association, the requirement makes it more likely that retailers will be familiar with the communities served by their stores, and this, it is suggested, will lead to responsible sales practices. Brief for Petitioner 48–49. The idea, it seems, is that a responsible neighborhood proprietor will counsel or cut off sales to patrons who are known to be abusing alcohol, who manifest the effects of alcohol abuse, or who perhaps appear to be purchasing too much alcohol. No evidence has been offered that durational-residency requirements actually foster such sales practices, and in any event, the requirement now before us is very poorly designed to do so.

For one thing, it applies to those who hold a license, not to those who actually make sales. For another, it requires residence in the State, not in the community that a store serves. The Association cannot explain why a proprietor who lives in Bristol, Virginia, will be less knowledgeable about the needs of his neighbors right across the border in Bristol, Tennessee, than someone who lives 500 miles away in Memphis. And the rationale is further undermined by other features of Tennessee law, particularly the lack of durational-residency requirements for owners of

bars and other establishments that sell alcohol for on-premises consumption. §57–4–201.

Not only is the 2-year residency requirement ill suited to promote responsible sales and consumption practices (an interest that we recognize as legitimate, contrary to the dissent's suggestion, *post*, at 9, 12, 14), but there are obvious alternatives that better serve that goal without discriminating against nonresidents. State law empowers the relevant authorities to limit both the number of retail licenses and the amount of alcohol that may be sold to an individual. Cf. §57–3–208(c) (permitting local governments to "limit . . . the number of licenses issued within their jurisdictions"); §57–3–204(d)(7)(C) (imposing volume limits on certain sales of alcohol to patrons); Rules of TABC, ch. 0100–01, §0100–01–.03(15) (2018) (same). The State could also mandate more extensive training for managers and employees and could even demand that they demonstrate an adequate connection with and knowledge of the local community. Cf., *e.g.,* Tenn. Code Ann. §57–3–221 (requiring managers of liquor stores to obtain permits, satisfy background checks, and undergo "alcohol awareness" training). And the State of course remains free to monitor the practices of retailers and to take action against those who violate the law.

Given all this, the Association has fallen far short of showing that the 2-year durational-residency requirement for license applicants is valid. Like the other discriminatory residency requirements that the Association is unwilling to defend, the predominant effect of the 2-year residency requirement is simply to protect the Association's members from out-of-state competition. We therefore hold that this provision violates the Commerce Clause and is not saved by the Twenty-first Amendment.[22]

---

[22] Our analysis and conclusion apply as well to the provision requiring all officers and directors of corporate applicants to satisfy the 2-year

Opinion of the Court

\*      \*      \*

The judgment of the Court of Appeals for the Sixth Circuit is affirmed.

*It is so ordered.*

—————

residency requirement.  See 883 F. 3d, at 623.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–96

_____

## TENNESSEE WINE AND SPIRITS RETAILERS ASSOCIATION, PETITIONER *v.* RUSSELL F. THOMAS, EXECUTIVE DIRECTOR OF THE TENNESSEE ALCOHOLIC BEVERAGE COMMISSION, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 26, 2019]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, dissenting.

Alcohol occupies a complicated place in this country's history. Some of the founders were enthusiasts; Benjamin Franklin thought wine was "proof that God loves us." Letter from B. Franklin to A. Morellet (July 1779), in 7 Writings of Benjamin Franklin 437 (A. Smyth ed. 1907). Many in the Prohibition era were decidedly less enamored; they saw "liquor [a]s a lawlessness unto itself." *Duckworth* v. *Arkansas*, 314 U. S. 390, 398 (1941) (Jackson, J., concurring in result). Over time, the people have adopted two separate constitutional Amendments to adjust and then readjust alcohol's role in our society. But through it all, one thing has always held true: States may impose residency requirements on those who seek to sell alcohol within their borders to ensure that retailers comply with local laws and norms. In fact, States have enacted residency requirements for at least 150 years, and the Tennessee law at issue before us has stood since 1939. Today and for the first time, the Court claims to have discovered a duty and power to strike down laws like these as unconstitutional. Respectfully, I do not see it.

Start with the text of the Constitution. After the Nation's failed experiment with Prohibition, the people assembled in conventions in each State to adopt the Twenty-first Amendment. In §1, they repealed the Eighteenth Amendment's nationwide prohibition on the sale of alcohol. But in §2, they provided that "[t]he transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The Amendment thus embodied a classically federal compromise: Nationwide prohibition ended, but States gained broad discretion to calibrate alcohol regulations to local preferences. And under the terms of this compromise, Tennessee's law imposing a two-year residency requirement on those who seek to sell liquor within its jurisdiction would seem perfectly permissible.[1]

Of course, §2 does not immunize state laws from *all* constitutional claims. Everyone agrees that state laws must still comply with, say, the First Amendment or the Equal Protection Clause. *Ante*, at 11–12. But the challenge before us isn't based on any constitutional provision like that. Instead, we are asked to decide whether Tennessee's residency requirement impermissibly discriminates against out-of-state residents and recent arrivals in violation of the "dormant Commerce Clause" doctrine. And that doctrine is a peculiar one. Unlike most constitutional rights, the dormant Commerce Clause doctrine

---

[1] The Court suggests that Tennessee's residency requirement may fall outside the terms of the Amendment because retailers may not be involved in the "transportation or importation" of liquor into the State. *Ante*, at 26. But the parties do not dispute that "transportation or importation" into the State is involved here. And understandably so: Unless the liquor stores intend to sell only Tennessee-made liquor (and no one so alleges), it is hard to see how transportation or importation would not be involved.

cannot be found in the text of any constitutional provision but is (at best) an implication from one. Under its banner, this Court has sometimes asserted the power to strike down state laws that discriminate against nonresidents on the ground that they usurp the authority to regulate interstate commerce that the Constitution assigns in Article I to Congress. But precisely because the Constitution assigns *Congress* the power to regulate interstate commerce, that body is free to rebut any implication of unconstitutionality that might otherwise arise under the dormant Commerce Clause doctrine by authorizing States to adopt laws favoring in-state residents. *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408, 434–436 (1946).

And that's exactly what happened here. In the Webb-Kenyon Act of 1913, Congress gave the States wide latitude to restrict the sale of alcohol within their borders. See 37 Stat. 699 (codified at 27 U. S. C. §122). Not only is that law still on the books today, §2 of the Twenty-first Amendment closely "followed the wording of the 1913 Webb-Kenyon Act." *Ante*, at 11, n. 5. Accordingly, the people who adopted the Amendment naturally would have understood it to constitutionalize an "exception to the normal operation of the [dormant] Commerce Clause." *Craig* v. *Boren*, 429 U. S. 190, 206 (1976). After all, what Congress can do by statute "surely the people may do . . . through the process of amending our Constitution." *Granholm* v. *Heald*, 544 U. S. 460, 494 (2005) (Stevens, J., dissenting). So in this area, at least, we should not be in the business of imposing our own judge-made "dormant Commerce Clause" limitations on state powers.

What the relevant constitutional and statutory texts suggest, history confirms. Licensing requirements for the sale of liquor are older than the Nation itself. Byse, Alcoholic Beverage Control Before Repeal, 7 Law & Contemp. Prob. 544, 544–547 (1940). Colonial authorities generally allowed sales only by those who were deemed "'fit and

suitable'" and who agreed to post a bond conditioned upon compliance with local regulations. *Id.*, at 545. States started adopting residency requirements as early as 1834, when New Hampshire began requiring any person who sold liquor "in any quantity less than one gallon" to obtain a license "from the selectmen of the town or place where such person resides." *State* v. *Adams*, 6 N. H. 532, 533 (1834). In 1845, Missouri adopted a law nearly identical to the Tennessee statute now before us, requiring those seeking to sell liquor to have resided in the State for two years. Mo. Rev. Stat. app., p. 1099. In the decades that followed, several other States and Territories followed suit and enacted laws like Tennessee's.[2]

At the time these residency requirements were adopted they were widely understood to be constitutional, and courts generally upheld them against legal challenges. H. Black, Laws Regulating the Manufacture and Sale of Intoxicating Liquors §30, pp. 39–40, and n. 33 (1892) (collecting cases). Indeed, in the mid-19th century this Court "recognized a broad authority in state governments to regulate the trade of alcoholic beverages within their borders free from implied restrictions under the Commerce Clause." *Craig*, 429 U. S., at 205 (citing the *License Cases*, 5 How. 504, 579 (1847)).

Things became more contentious only toward the end of the 19th century. By then, this Court had begun to take a more muscular approach to the dormant Commerce Clause and started using that implied doctrine to strike down state laws that restricted the sale of imported liquor. See *Bowman* v. *Chicago & Northwestern R. Co.*, 125 U. S.

───────────

[2] See, *e.g.*, 1859 Neb. Terr. Laws p. 256; Iowa Code §1575 (1860); 1875 Pa. Laws p. 42; N. Y. Rev. Stat. ch. 29, §23 (1896); S. C. Code Ann. §562 (1902); Minn. Stat. §1529 (1905); R. I. Gen. Laws, ch. 123, §2 (1909); 1911 Ala. Acts no. 259; Neb. Rev. Stat. §3844 (1913); Ind. Code §8323(e) (1914).

465 (1888); *Leisy* v. *Hardin*, 135 U. S. 100 (1890). But this judicial activism did not go unnoticed, and in 1890 Congress responded by passing the Wilson Act. Ch. 728, 26 Stat. 313 (codified at 27 U. S. C. §121). That law sought to bolster the authority of States to regulate the distribution of liquor within their borders by providing that liquor shipped into a State would "upon arrival in such State . . . be subject to the operation and effect of the laws of such State . . . to the same extent and in the same manner as though such [liquor] had been produced in such State."

Still, the Court did not seem to get the message. A second wave of dormant Commerce Clause attacks on state laws soon followed, and in the process they highlighted some of the Wilson Act's limitations. In *Scott* v. *Donald*, 165 U. S. 58 (1897), the Court addressed South Carolina's state monopoly system for the sale of liquor, which required state agents to favor domestic products and prohibited consumers from receiving out-of-state shipments for personal use. The Court held that this system unconstitutionally discriminated in favor of domestic products "as against similar products of the other States." *Id.*, at 101. Citing the text of the Wilson Act, including the phrase "to the same extent and in the same manner," the Court emphasized that the Act did not go so far as to authorize States to "discriminate injuriously against products of other States." *Id.*, at 100. Then, in *Rhodes* v. *Iowa*, 170 U. S. 412 (1898), the Court further curbed the States' authority to restrict liquor distribution by construing the Wilson Act's phrase "upon arrival in such State" to mean arrival at the purchaser's address, rather than arrival within the State's borders. *Id.*, at 421, 426; see also *Vance* v. *W. A. Vandercook* Co., 170 U. S. 438 (1898).

Once more, however, Congress stepped in to repudiate this Court's decisions, this time in unmistakably sweeping language. In the Webb-Kenyon Act of 1913, Congress

went so far as to "[take] the protection of interstate commerce *away*" from the distribution of liquor within a State's borders. *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311, 325 (1917) (emphasis added). The language Congress used could not have been plainer: The Act "prohibited" any "shipment or transportation" of alcoholic beverages "into any State" when they are "intended, by any person interested therein, to be received, possessed, sold, or in any manner used . . . in violation of any law of such State." 27 U. S. C. §122. Within a few years, the Court conceded the Webb-Kenyon Act's constitutionality, acknowledging along the way that the law was designed to—and did—"prevent the immunity characteristic of interstate commerce from being used to permit the receipt of liquor through such commerce in States contrary to their laws." *Clark Distilling*, 242 U. S., at 324.[3]

This history bears special relevance because everyone agrees that, whatever other powers §2 grants the States,

---

[3] The Court cites a few pre-Prohibition cases—from one federal district court and two state courts—that, it says, construed Webb-Kenyon to preserve a rule against discrimination. *Ante*, at 20, n. 12. But these cases offer negligible support. True, two cases construed the Act's authorization of "any laws" as limited to "valid laws," a category from which these courts excluded laws discriminating against the products of other States. See *Evansville Brewing Assn.* v. *Excise Comm'n of Jefferson Cty.*, *Ala.*, 225 F. 204, 208 (ND Ala. 1915); *Brennen* v. *Southern Express Co.*, 106 S. C. 102, 108–111, 90 S. E. 402, 404 (1916). But there is little reason to think courts would have considered residency requirements for liquor retailers "invalid," as those laws had generally been upheld prior to Webb-Kenyon. And at least one of the cited cases appears to support the opposite view: "[A]ll commands or prohibitions ancillary and reasonably related to the state's purpose to promote temperance . . . cannot be thwarted or annulled on any idea that constitutional rights are thereby violated." *Southern Express Co.* v. *Whittle*, 194 Ala. 406, 436, 69 So. 652, 661 (1915). At any rate, a few scattered, thinly reasoned state and district court cases hardly settle anything.

at a minimum it "'constitutionaliz[ed]'" the similarly
worded Webb-Kenyon Act. *Ante*, at 11, n. 5, 21. Nor can
there be much doubt how most everyone understood the
terms of the Act and the Amendment that embodied it.
Because "centralized regulation did not work," the Twenty-
first Amendment both ended nationwide prohibition in §1
and authorized local control in §2. Yablon, The Prohibi-
tion Hangover: Why We Are Still Feeling the Effects of
Prohibition, 13 Va. J. Soc. Pol'y & L. 552, 584 (2006). As a
leading study noted at the time, "it was a mistake to re-
gard the United States as a single community in which a
uniform policy of liquor control could be enforced." R.
Fosdick & A. Scott, Toward Liquor Control 10 (1933)
(Fosdick & Scott). Ours is a vast and diverse Nation, and
those who adopted the Amendment believed that what
works for one State may not work for another. Consistent
with this widespread public understanding of the Amend-
ment's terms, at least 18 States adopted residency re-
quirements for retailers within the first 15 years after its
ratification.[4]

This Court's initial cases also reflected the same under-
standing of the Amendment's effect. Just a few years after
ratification, a unanimous Court upheld discriminatory
state liquor laws against a dormant Commerce Clause
attack, explaining that "to construe the Amendment as
saying, in effect: [the State] must let imported liquors
compete with the domestic on equal terms . . . would in-
volve not a construction of the Amendment, but a rewrit-

————————

[4] *Granholm* v. *Heald*, 544 U. S. 460, 518, and n. 6 (2005) (THOMAS, J.,
dissenting) (collecting state statutes); Brief for Petitioner 33–34 (same).
See also Note, Economic Localism in State Alcoholic Beverage Laws—
Experience Under the Twenty-first Amendment, 72 Harv. L. Rev. 1145,
1148–1149, and n. 25 (1959). At least 10 States, including Tennessee,
required a fixed period of residency of one year or more. Brief for
Petitioner 34 (collecting statutes).

ing of it." *State Bd. of Equalization of Cal.* v. *Young's
Market Co.*, 299 U. S. 59, 62 (1936). Other early cases
reached similar conclusions. See, *e.g.*, *Mahoney* v. *Joseph
Triner Corp.*, 304 U. S. 401, 403 (1938) ("[D]iscrimination
against imported liquor is permissible"); *Indianapolis
Brewing Co.* v. *Liquor Control Comm'n*, 305 U. S. 391, 394
(1939) ("Whether the Michigan law should not more
properly be described as a protective measure, we have no
occasion to consider," for "whatever its character, the law
is valid"). In short, this Court "recognized from the start"
that the Twenty-first Amendment allowed the States to
regulate alcohol "'unfettered by the Commerce Clause.'"
*Granholm*, 544 U. S., at 517 (THOMAS, J., dissenting).[5]

Straying from the text, state practice, and early prece-
dent, and leaning instead on the Amendment's famously
sparse legislative history, the Court says it can find no
evidence that §2 was *intended* to authorize "protectionist"
state laws. *Ante*, at 21, 22 n. 15. But even there plenty of
evidence can be found that those who ratified the Amend-
ment wanted the States to be able to regulate the sale of
liquor free of judicial meddling under the dormant Com-
merce Clause—and there is no evidence they wanted
judges to have the power to decide that state laws restricted

----

[5] The Court discounts the compelling evidence of postratification
practice because, it suggests, States may have been relying on the
Court's expansive interpretation of §2 in *State Bd. of Education of Cal.*
v. *Young's Market*, 299 U. S. 59 (1936), rather than their own inde-
pendent understanding of the Amendment. *Ante*, at 29. But most of
the residency requirements were enacted *before* that November 1936
decision. Although many of the statutes were *codified* after *Young's
Market*, a large majority were *enacted* earlier. Compare, *e.g.*, Wyo.
Stat. Ann. §53–204 (1945); Idaho Code Ann. §18–130 (1940); R. I. Gen.
Laws ch. 163 §4 (1938); N. J. Rev. Stat. §33:1–25 (1937); with 1935 Wy.
Sess. Laws ch. 87; 1935 Idaho Sess. Laws ch. 103; 1934 R. I. Laws p. 52;
1933 N. J. Laws p. 1193.

competition "too much."[6]  After all, both before Prohibition and after repeal, robust competition in the liquor industry was far from universally considered an unalloyed good; lower prices enabled higher consumption and invited social problems along the way.  T. Pegram, Battling Demon Rum 94–96 (1998); Fosdick & Scott 43–44, 81.  The point of §2 was to allow each State the opportunity to assess for itself the costs and benefits of free trade in alcohol.  Reduced competition and increased prices were foreseeable consequences of allowing such unfettered state regulation, but they were consequences the people willingly accepted with the compromise of the Twenty-first Amendment.[7]

—————

[6] See, *e.g.*, 76 Cong. Rec. 4143 (1933) (statement of Sen. Blaine) ("The purpose of section 2 is to restore to the States by constitutional amendment absolute control in effect over interstate commerce affecting intoxicating liquors"); *id.*, at 4225 (statement of Sen. Swanson) ("[I]t is left entirely to the States to determine in what manner intoxicating liquors shall be sold or used and to what places such liquors may be transported"); Ratification of the Twenty-first Amendment to the Constitution of the United States: State Convention Records and Laws 50 (E. Brown ed. 1938) (statement of President Robinson of the Connecticut convention) ("[F]undamentally our fight has been . . . for the return to the peoples of the several states of their constitutional right to govern themselves in their internal affairs"); *id.*, at 174 (statement of Del. Simmons to the Kentucky convention) ("The regulation of the sale of liquor is a state concern"); *id.*, at 247 (statement of Mme. Chairman Gaylord of the Missouri convention) ("We have never been in favor of a National Regulation to take the place of the 18th Amendment . . . .  We believe that each state should work out sane and sensible liquor control measures, responsive to the sentiment of the people of each state"); *id.*, at 322 (statement of Gov. White of Ohio) ("[T]he control of intoxicating liquors presents a problem of first magnitude," and "[t]he solution of the problem will be returned to the several states").

[7] The majority worries that giving full effect to §2 might allow a State to pass a statute restricting licenses to persons whose ancestors have resided in the State for 200 years.  *Ante*, at 22, n. 15.  But under parts of the Constitution that §2 left intact, such as the Equal Protection and

That leaves only our modern precedent to consider—and even here the initial returns support Tennessee. In *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324 (1964), for example, this Court addressed a New York law that interfered with the federally regulated sale of alcohol to passengers departing from an airport, which the passengers would not receive until they arrived at their "foreign destination." *Id.*, at 325. Emphasizing that "ultimate delivery and use" was "in a foreign country," this Court held that the Twenty-first Amendment did not permit New York to "prevent transactions carried on under the aegis of a law passed by Congress in the exercise of its explicit power under the Constitution to regulate commerce with foreign nations." *Id.*, at 333–334. But at the same time, the Court took pains to reassure everyone that the States' core authority to "restrict, regulate, or prevent the traffic and distribution of intoxicants within [their] borders" remained "unquestioned" and "unconfined" by the dormant Commerce Clause. *Id.*, at 330; see also *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 713 (1984) (describing "the core §2 power" as a State's authority "directly to regulate the sale or use of liquor within its borders").

Consistent with that understanding, this Court in *Heublein, Inc.* v. *South Carolina Tax Comm'n*, 409 U. S. 275 (1972), unanimously upheld a South Carolina law permitting producers to transfer liquor to in-state wholesalers only through "resident representative[s]." *Id.*, at 277. Because the requirement was an "appropriate element in

————————

Due Process clauses, any state law must bear a rational relationship to a legitimate state interest. Besides and understandably, the evidence before us suggests that the people who ratified §2 weren't as concerned with States adopting fanciful laws like the majority's as they were with eliminating a very real threat—that judges would continue to use the dormant Commerce Clause to meddle with state regulatory authority.

the State's system" of regulating the sale of alcohol "'within its borders,'" this Court held that the State could enforce it "'unconfined by traditional Commerce Clause limitations.'" *Id.*, at 283 (quoting *Hotstetter*, 377 U. S., at 330). To be sure, in even later cases the Court declined to uphold state laws that, in substantial effect, regulated the sale of alcohol in *other* states. *E.g.*, *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573 (1986); *Healy* v. *Beer Institute*, 491 U. S. 324 (1989). But those decisions merely tracked the text of the Twenty-first Amendment, which grants States the power to regulate liquor only "for delivery or use *therein.*"

The truth is, things have begun to shift only in very recent years. Bending to the same impulses that moved it at the beginning of the 20th century, this Court has lately begun flexing its dormant Commerce Clause muscles once more to strike down state laws even in core areas of state authority under §2. So, for example, in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), the Court considered Hawaii's tax exemption for certain liquor products manufactured in-state. As the Court described it, Hawaii's sole "purpose" in adopting its tax exemption was "'to promote a local industry,'" not "to promote temperance." *Id.*, at 276. And a narrow majority considered this fact fatal because the law, in its judgment, did not implicate "any clear concern" of the Amendment—even though the Amendment was adopted to insulate state regulation from judicial charges of unduly interfering with interstate commerce. *Ibid.*

Yet, even under as bold a decision as *Bacchus*, Tennessee's residency requirement should survive—and easily. A residency requirement may not be the only way to ensure retailers will be amenable to state regulatory oversight, but it is surely one reasonable way of accomplishing that

admittedly legitimate goal.[8]  Residency also increases the
odds that retailers will have a stake in the communities
they serve.[9]  As Judge Sutton observed in the proceedings
below, this same commonsense rationale may explain why
Congress requires federal court of appeals judges to live
within their circuits, 28 U. S. C. §44(c), and district court
judges to live within their districts, §134(b).  *Byrd* v. *Ten-
nessee Wine and Spirits Retailers Assn.*, 883 F. 3d 608, 633
(2018).  Surely, Tennessee cannot be faulted for sharing a
similar view.  Of course, Tennessee's residency require-
ment reduces competition in the liquor market by exclud-
ing nonresidents or recent arrivals.  But even that effect
might serve a legitimate state purpose by increasing the
price of alcohol and thus moderating its use, an objective
States have always remained free to pursue under the
bargain of the Twenty-first Amendment.[10]

To defend its judgment today, the Court is thus left to
try to wring support from our 2005 decision in *Granholm*.
*Granholm* extended *Bacchus* and its reasoning to strike
down on dormant Commerce Clause grounds a state law
for disfavoring out-of-state wine producers, holding that

_____

[8] See *Southern Wine & Spirits of Am., Inc.* v. *Division of Alcohol and
Tobacco Control*, 731 F. 3d 799, 811 (CA8 2013) (Colloton, J.);
*Hinebaugh* v. *James*, 119 W. Va. 162, 164, 192 S. E. 177, 179 (1937);
*Welsh* v. *State*, 126 Ind. 71, ___, 25 N. E. 883, 885 (1890); Note, 72
Harv. L. Rev., at 1148.

[9] See *Byrd* v. *Tennessee Wine and Spirits Retailers Assn.*, 883 F. 3d
608, 633 (2018) (CA6 2018) (Sutton, J., concurring in part and dissent-
ing in part); *Southern Wine & Spirits*, 731 F. 3d, at 811.

[10] See Brief for U. S. Alcohol Policy Alliance et al. as *Amici Curiae* 5–
24; Lawson, The Future of The Three-Tiered System as a Control of
Marketing Alcoholic Beverages, in Social and Economic Control of
Alcohol 32–34 (C. Jurkiewicz & M. Painter eds., 2008); 883 F. 3d, at 634
(opinion of Sutton, J.); cf. *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S.
484, 504 (1996) (acknowledging a State's legitimate interest in "reduc-
ing alcohol consumption").

"Section 2 does not allow States to regulate the direct shipment of wine on terms that discriminate in favor of in-state *producers*." 544 U. S., at 476 (emphasis added). But even this holding doesn't spell doom for Tennessee's retailer residency requirements. As even the Court today acknowledges, "*Granholm* repeatedly spoke of discrimination against out-of-state products and producers" and did not refer more generally to discrimination against nonresidents. *Ante*, at 27.[11]

To claim *Granholm*'s support, the majority is thus forced to characterize *Granholm*'s framing of the issue before it as purely incidental—the state laws at issue there happened to discriminate against out-of-state products, so the Court just happened to talk a lot about products. As the Court seems to read *Granholm*, then, it really meant to disapprove *any* discrimination against out-of-staters. But this badly misreads *Granholm*. The distinction between producers and other levels of the distribution system was integral to its reasoning and result—in fact, it was precisely how *Granholm* sought to reconcile its result with the longstanding tradition of state residency requirements. So yes, *Granholm* held that the Twenty-first Amendment does not protect laws that discriminate against out-of-state products, but it *also* expressly reaffirmed the "'unquestionabl[e] legitima[cy]'" of state laws that require "'all liquor sold for use in the State [to] be purchased from a licensed in-state wholesaler.'" 544 U. S., at 489 (quoting *North Dakota* v. *United States*, 495 U. S. 423, 432 (1990); *id.*, at 447 (Scalia, J., concurring in judgment)). And I would have thought that restatement of the law more than

―――――――

[11] See also *Granholm*, 544 U. S., at 486 ("States may not give a discriminatory preference to their own producers"); *id.*, at 484–485 ("The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time").

enough to resolve today's case.

Having now effectively abandoned *Granholm*'s distinc-
tion between products and their distribution and promis-
ing to subject both to dormant Commerce Clause scrutiny,
it's hard not to wonder what's left of Webb-Kenyon and §2.
For its part, the Court assures us that it will still allow
each State "leeway to enact the measures that *its citizens
believe* are appropriate" to address public health and
safety. *Ante*, at 31 (emphasis added). Yet the Court then
proceeds to turn around and dismantle the longstanding
judgment of the citizens of Tennessee on just these ques-
tions, dismissing them as "protectionist measures with no
demonstrable connection" to public health and safety.
*Ibid.* And it promises it will not sustain any state law
whose protectionist "effect[s] . . . predomina[te]." *Ante*, at
32–33.

What are lower courts supposed to make of this? How
much public health and safety benefit must there be to
overcome this Court's worries about protectionism "pre-
dominat[ing]"? Does reducing competition in the liquor
market, raising prices, and thus reducing demand still
count as a public health benefit, as many States have long
supposed? And if residency requirements are problematic,
what about simple physical *presence* laws? After all, can't
States "thoroughly investigate applicants" for liquor li-
censes without requiring them to have a brick-and-mortar
store in the State? *Ante*, at 34. The Court offers lower
courts no more guidance than to proclaim delphically that
"each variation must be judged based on its own features."
*Ante*, at 28.

As judges, we may be sorely tempted to "rationalize" the
law and impose our own free-trade rules for all goods and
services in interstate commerce. Certainly, that tempta-
tion seems to have proven nearly irresistible for this Court
when it comes to alcohol. And as Justice Cardozo once
observed, "an intellectual passion . . . for symmetry of form

and substance" is "an ideal which can never fail to exert some measure of attraction upon the professional experts who make up the lawyer class." B. Cardozo, The Nature of the Judicial Process 34 (1921). But real life is not always so tidy and satisfactory, and neither are the democratic compromises we are bound to respect as judges. Like it or not, those who adopted the Twenty-first Amendment took the view that reasonable people can disagree about the costs and benefits of free trade in alcohol. They left us with clear instructions that the free-trade rules this Court has devised for "cabbages and candlesticks" should not be applied to alcohol. *Carter* v. *Virginia*, 321 U. S. 131, 139 (1944) (Frankfurter, J., concurring). Under the terms of the compromise they hammered out, the regulation of alcohol wasn't left to the imagination of a committee of nine sitting in Washington, D. C., but to the judgment of the people themselves and their local elected representatives. State governments were supposed to serve as "laborator[ies]" of democracy, *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting), with "broad power to regulate liquor under §2," *Granholm*, 544 U. S., at 493. If the people wish to alter this arrangement, that is their sovereign right. But until then, I would enforce the Twenty-first Amendment as they wrote and originally understood it.