COURT OF APPEALS OF VIRGINIA

Present:   Judges Raphael, White and Senior Judge Petty
Argued at Richmond, Virginia

**PUBLISHED**

VIRGINIA ALCOHOLIC BEVERAGE
  CONTROL AUTHORITY

v.      Record No. 0973-22-2

ZERO LINKS MARKETS, INC.,
  T/A VINOSHIPPER.COM

OPINION BY
JUDGE STUART A. RAPHAEL
AUGUST 15, 2023

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
David Eugene Cheek, Sr., Judge

Maureen E. Mshar, Associate Legal Counsel (Rachel L. Yates,
Associate Legal Counsel; Virginia Alcoholic Beverage Control
Authority, on briefs), for appellant.

Mark C. Shuford (Sean O'Leary; The Shuford Law Group, LLC;
O'Leary Law and Policy Group, LLC, on briefs), for appellee.

Amici Curiae: Virginia Wine Wholesalers Association and
Virginia Beer Wholesalers Association (Kevin R. McNally; Moira
J. O'Brien; Marston & McNally, P.C., on brief), for appellant.

The Alcoholic Beverage Control (ABC) Act regulates the manufacture, sale, and

distribution of alcoholic beverages in Virginia.  The Act requires a "separate license" from the

Virginia Alcoholic Beverage Control Authority (Authority) for "each separate place of

business."  Code § 4.1-203(A).  The Act defines the term "place" as "the real estate, together

with any buildings or other improvements thereon . . . at which the manufacture, bottling,

distribution, use or sale of alcoholic beverages shall be performed."  Code § 4.1-100.

Appellee Zero Links Markets, Inc., trading as VinoShipper.com (VinoShipper), obtained

a Virginia ABC license to sell and ship wine to Virginia customers from VinoShipper's business

address in Windsor, California.  After customers buy wine on its website, however, VinoShipper

delegates to various wineries across the country the business of selecting and boxing the wine, labeling the package, and tendering the shipment to the common carrier for delivery to the customer in Virginia. Adopting the findings of the hearing officer, the ABC Board concluded that VinoShipper was shipping wine from unlicensed locations in violation of Code § 4.1-203(A). The ABC Board temporarily suspended VinoShipper's license but stayed the suspension pending VinoShipper's appeal to the circuit court. On appeal, the circuit court reversed the Board's order.

The Authority appealed that ruling, and we now reverse. We hold that the Board correctly applied the ABC Act in concluding that the requirement in Code § 4.1-203(A) for a "separate license . . . for each separate place of business" applies to the locations where the wineries under contract with VinoShipper select, package, label, and ship the wine on VinoShipper's behalf to its Virginia customers. Those locations are VinoShipper's "place[s] of business," *id.*, at which essential aspects of the sale and shipment of alcoholic beverages are performed. No statutory exception excuses VinoShipper from the separate-license-for-each-place-of-business requirement, such as Code § 4.1-209.1(F)'s exemption allowing wine shippers to delegate shipping functions to Board-licensed "fulfillment warehouse[s]." The ABC Board thus committed no error of law in rendering its decision.

BACKGROUND

*A. The ABC Board's regulatory power*

Virginia's regulation of intoxicating beverages has a long and rich history that predates independence. As early as 1668, the General Assembly directed the commissioners of each county court to allow no more than two drinking establishments per locality. 2 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 268-69 (1823) (Act IX, *About Ordinaries* (1668)). The preamble recited

- 2 -

concern about "the excessive number of ordinaryes and tipling houses . . . found to be full of mischeif . . . by cherishing idlenes and debaucheryes," with "loose and carelesse persons . . . neglecting their callings [and] mispend[ing] their times in drunkennesse." *Id.* at 268.[1] Persons operating ordinaries or tippling houses without a "lycence" were to be fined 2,000 pounds of tobacco. *Id.* at 269.[2]

Over the next two centuries, the General Assembly regularly updated and revised the license requirements for such establishments, vesting discretion in county and corporation courts to determine the fitness of each licensee. *See Ex parte Yeager*, 52 Va. (11 Gratt.) 655, 658-62 (1854) (surveying Virginia's licensing laws from 1668[3] through 1849). The Court in *Yeager* found that this long statutory history reflected the legislature's "fears . . . that the morals of the people might sustain injury from the granting of too many licenses." *Id.* at 662.

A half-century later, Virginia's Constitution of 1902 granted the General Assembly "full power to enact local option or dispensary laws, or any other laws controlling, regulating, or prohibiting the manufacture or sale of intoxicating liquors." Va. Const. art. IV, § 62 (1902). For another 14 years, the General Assembly continued to require manufacturers, wholesalers, and retail sellers of alcoholic beverages to obtain liquor licenses from local courts.[4]

---

[1] In Virginia, an ordinary was "[a] tavern or inn of any kind." *Ordinary, The Compact Edition of the Oxford English Dictionary* (1971) (O.E.D.). A "tippling-house" was a "house where intoxicating liquor [was] sold and drunk; an alehouse, a tavern." *Tippling-house*, O.E.D., *supra*.

[2] The General Assembly repealed the two-establishment cap in 1704, concluding that the limit had caused "great Inconveniencys and Hardshipps for want of Publick Houses of Entertainment." *The Laws of Virginia; Being a Supplement to Hening's The Statutes at Large, 1700-1750*, 27 (1971).

[3] *Yeager* misstated the date of the act of 1668, 2 Hening, *supra*, at 268, as "the act of 1666." 52 Va. (11 Gratt.) at 661.

[4] *See, e.g.*, 1910 Va. Acts ch. 190; 1908 Va. Acts ch. 189; 1902-04 Va. Acts Extra Sess. chs. 148 (§ 143), 579.

But public opinion soon turned against the sale of intoxicating beverages. In 1914, the General Assembly authorized a referendum on statewide prohibition, which passed with nearly 60% of the vote. Robert A. Hohner, *Prohibition Comes to Virginia: The Referendum of 1914*, 75 Va. Mag. Hist. & Biography 473, 487 & n.78 (1967) ("an overwhelming majority"). In 1916, the General Assembly banned the manufacture, transport, and sale of alcoholic beverages in the Commonwealth. 1916 Va. Acts ch. 146, § 3. In 1918, Virginia became the first State to ratify the Eighteenth Amendment to the United States Constitution. *See* 1918 Va. Acts ch. 428; *Ratification of the Prohibition Amendment*, S. Doc. No. 66-169, at 2 (1919). The Eighteenth Amendment was fully ratified in 1919, prohibiting nationwide "the manufacture, sale or transportation of intoxicating liquors . . . for beverage purposes." *Amendment to the Constitution, 1919*, 40 Stat. 1941 (1919).

The Twenty-first Amendment, ratified in 1933, repealed the Eighteenth Amendment and, in doing so, established an independent source of constitutional authority for States to regulate the sale and distribution of alcoholic beverages. U.S. Const. amend. XXI. Section 2 provided that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, *in violation of the laws thereof*, is hereby prohibited." *Id.*, § 2 (emphasis added). Section 2 "was meant to 'constitutionaliz[e]' the basic understanding of the extent of the States' power to regulate alcohol that prevailed before Prohibition." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2467 (2019) (alteration in original). "The aim . . . was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use." *Granholm v. Heald*, 544 U.S. 460, 484 (2005).

The United States Supreme Court has held that Section 2 "grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the

liquor distribution system." *Id.* at 488 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980)). "It gives each State leeway in choosing the alcohol-related public health and safety measures that its citizens find desirable." *Tenn. Wine*, 139 S. Ct. at 2457.[5]

At a referendum in October 1933, Virginia voters opposed statewide prohibition but favored enacting a plan of liquor control. *See* 1933-34 Va. Acts Extra Sess. ch. 4; S. Doc. No. 5, *Liquor Control: Report of the Committee appointed under authority of an Act approved August 29, 1933*, at 1 (1934). In March 1934, the General Assembly established the Virginia Alcoholic Beverage Control Board to regulate the alcoholic-beverage market in Virginia. *See* 1933-34 Va. Acts Extra Sess. ch. 94, § 3.

From the outset, the regulatory model created a "three-tier distribution system," generally requiring "[s]eparate licenses . . . for producers, wholesalers, and retailers." *Granholm*, 544 U.S. at 466.[6] For instance, the 1934 law prohibited vertical integration among market participants,

---

[5] The States' power under Section 2 is not absolute. It does not "override[] all previously adopted constitutional provisions," *Tenn. Wine*, 139 S. Ct. at 2468, such as protections guaranteed by the First and Fourteenth Amendments, *id.* at 2469. Nor does it "give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time." *Granholm*, 544 U.S. at 484-85.

[6] *Granholm* made clear that "States can mandate a three-tier distribution scheme in the exercise of their authority under the Twenty-first Amendment." 544 U.S. at 466. In explaining the history of three-tier systems, *Granholm* repeatedly cited portions of a report by the Federal Trade Commission, *Possible Anticompetitive Barriers to E–Commerce: Wine* (July 2003), https://www.ftc.gov/sites/default/files/documents/reports/possible-anticompetitive-barriers-e-commerce-wine/winereport2_0.pdf. *See* 544 U.S. at 466-68. The FTC Report explained:

> The three-tier system developed after the passage of the Twenty-First Amendment . . . as a means for states to regulate alcohol distribution. By requiring producers to sell wine through wholesalers, states hoped to collect taxes more efficiently and to limit alcohol sales to minors. States also hoped to prevent organized crime from gaining control of alcohol distribution.

forbidding a "manufacturer, bottler, or wholesaler of alcoholic beverages" from obtaining a retailer's license. 1933-34 Va. Acts Extra Sess. ch. 94, § 21. The current version of Virginia's ABC Act generally maintains that three-tier system for the stated purpose of "prevent[ing] suppliers from dominating local markets through vertical integration and to prevent excessive sales of alcoholic beverages caused by overly aggressive marketing techniques." Code § 4.1-215(C).

To administer this complex regulatory system, the ABC Act grants the ABC Board "plenary power to prescribe and enforce regulations and conditions under which alcoholic beverages are possessed, sold, transported, distributed, and delivered, so as to prevent any corrupt, incompetent, dishonest, or unprincipled practices and to promote the health, safety, welfare, convenience, and prosperity of the people of the Commonwealth." Code § 4.1-101(A). Exercising that plenary authority, the Board administers a litany of different types of liquor licenses, including licenses to "distilleries, wineries, farm wineries, breweries, and bottlers of alcoholic beverages; wholesalers, wholesale salesmen and retailers of wine and beer; beer and wine importers; and certain warehouses." 3 VAC 5 (Summary).

This case involves a wine-shipper's license, which authorizes the licensee to "sell and ship not more than two cases of wine per month . . . to any person in Virginia to whom alcoholic beverages may be lawfully sold." Code § 4.1-209.1(A). A wine-shipper's license is a kind of retailer's license, enabling the licensee to ship wine directly to the consumer, rather than to a wholesaler. *See* Code § 4.1-206.3(F)(1). The General Assembly initially extended that privilege only to licensed Virginia wineries; but after a federal district court invalidated that practice under

Finally, some states may have sought to promote temperance by keeping the price of alcohol artificially high.

FTC Report, *supra*, at 6 (footnotes omitted).

- 6 -

the Dormant Commerce Clause, *see Bolick v. Roberts*, 199 F. Supp. 2d 397, 407, 447 (E.D. Va. 2002), *vacated as moot by Brooks v. Vassar*, 462 F.3d 341, 349 (4th Cir. 2006), the General Assembly amended the ABC Act to extend direct-shipping privileges to licensed out-of-State shippers as well. *See* 2003 Va. Acts ch. 1029. By 2020, the Authority was overseeing about 1,400 active shipper licenses for companies shipping wine or beer to Virginia customers.

### B. The separate-license-for-each-place-of-business requirement

Regardless of the type of license, the ABC Act requires that "[e]ach license granted by the Board . . . designate the place where the business of the licensee will be carried on." Code § 4.1-203(A). Unless specifically exempted by another provision of the law, "a separate license [is] required for each separate place of business." *Id.* And each such license must be "posted in a location conspicuous to the public at the place where the licensee carries on the business for which the license is granted." Code § 4.1-203(C).

### C. VinoShipper's license and business model

VinoShipper is a California-based wine shipper that sells wine to customers throughout the United States. VinoShipper was formed in 2006 and began selling wine in 2007. It received its first Virginia wine-shipper's license in 2007, and it has renewed that license annually since then. VinoShipper's license lists only its Windsor, California address as its place of business.

When a customer buys wine on VinoShipper's website, VinoShipper verifies the customer's age and ensures that the purchase does not exceed any per-person volume limit imposed under the law of the customer's State. VinoShipper then buys the wine from the winery, and the winery selects and boxes the wine.

Code § 4.1-209.1(C) requires that "[a]ll licensees shipping wine" to Virginia customers must "affix a conspicuous notice" with preprinted text that specifies that the package contains alcoholic beverages and that only persons 21 years or older may receive the delivery. As the

company has no employees of its own on-site at the various wineries it contracts with, VinoShipper generates the over-21 label and the shipping label and sends them to the wineries. The wineries are then responsible under their contracts with VinoShipper for affixing the shipping labels to the package and tendering the package to the common carrier for delivery to the customer. When the wine is ready to ship, VinoShipper directs UPS—the common carrier it uses—to pick up the shipment from the winery and transport it to the customer.[7]

### D. *VinoShipper's prior knowledge of the separate-license requirement*

The Authority maintains that the separate-license requirement in Code § 4.1-203(A) mandates that VinoShipper have a separate license for all places where the business of selling and shipping wine occurs, including where, on VinoShipper's behalf, the wineries package the wine for shipment, apply the shipping and over-21 labels, and tender the package to UPS for delivery to the customer. VinoShipper insists that the ABC Act requires a wine-shipper's license only for its Windsor, California address—the place from which VinoShipper directs all shipping activities.

The parties' evidence before the hearing officer was in conflict about *when* VinoShipper first learned of the Authority's interpretation of the separate-license requirement. The hearing officer received into evidence three ABC "circular" letters, all dated July 22, 2009. A circular letter is a "guidance document" that "provides information or guidance of general applicability to the staff or public to interpret or implement statutes or the agency's rules or regulations." Code § 2.2-4101. But a guidance document does not have the force of law. *See Dep't of Taxation v.*

---

[7] This practice is sometimes referred to as "drop-shipment delivery." *See Ship*, *Black's Law Dictionary* (11th ed. 2019) (defining "drop-shipment delivery" as the "manufacturer's shipment of goods directly to the consumer rather than initially to a wholesaler"). The amici tell us that "drop-shipping has become a business mainstay for internet retailers . . . . Drop-shipping presents a very lucrative business model, insofar as the internet vendor earns a profit on the sale of the goods without ever having to touch or store them." Brief of Amici Curiae Virginia Wine Wholesalers Association and Virginia Beer Wholesalers Association 17.

*1887 Holdings, Inc.*, 77 Va. App. 653, 665 (2023); *Va. Retirement Sys. v. Shelton*, 76 Va. App. 167, 182 (2022).

Circular Letter 09-03, addressed to "Virginia Farm Wineries," stated that the ABC Act "strictly prohibited" a Virginia farm winery from receiving a wine order from a licensed out-of-state wine shipper and then using the wine shipper's shipping label to ship that wine directly to a Virginia customer. Circular Letter 09-04, addressed to "All Approved Virginia ABC Common Carriers," stated that such common carriers needed to "verify the existence of a valid shipper's license and that the shipment is originating from the premises of the licensee." It also advised that "[t]he licensed direct shipper may not contract with 'third parties' such as fulfillment warehouses, marketing companies or other businesses to receive or ship orders for them." Circular Letter 09-06, addressed to "All Virginia Licensed Shippers," similarly stated that in-state and out-of-state shipper licensees "may not contract with third parties such as fulfillment warehouses, marketing companies, or other businesses to receive or ship orders for them." It added that all orders "must be shipped through approved common carriers from [the licensee's] licensed location by [the licensee's] employees."

ABC Special Agent Marc Haalman testified that VinoShipper, as a licensed out-of-state wine shipper, would have been on the distribution list for Circular Letter 09-06. ABC Senior Special Agent John Craft testified that he personally contacted VinoShipper after those circular letters were issued in 2009 to warn VinoShipper that it could not have wine shipped to customers directly from locations lacking a Virginia license. Craft said that he believed at the time that VinoShipper had agreed to comply by shipping wine only from its licensed address in California.

Those three circular letters are no longer posted on Virginia's regulatory Town Hall website. Special Agent Haalman testified that the circular letters were taken down in 2010 after the General Assembly amended the ABC Act to permit licensed shippers to ship beer or wine

using a Board-licensed "fulfillment warehouse" that would select, package, and ship the wine on the shipper's behalf. *See also* 2010 Va. Acts chs. 317, 561 (§§ 4.1-209(A)(10), 4.1-209.1(F)).

VinoShipper's president and chief-executive officer, Steven Harrison, testified that in 2009, he knew about only Circular Letter 09-03, not the other two. He interpreted Circular Letter 09-03 to mean that VinoShipper could not contract with *Virginia* wineries to ship wine to Virginia customers using VinoShipper's shipping labels. With that understanding, VinoShipper stopped selling wine to Virginia customers from Virginia wineries. It continued, however, to sell and ship wine to Virginia customers directly from out-of-state wineries lacking a Virginia license.

### E. The present charge

In October 2019, the Authority received inquiries from other licensees about whether VinoShipper's business model was allowed by the ABC Act. In reviewing direct-shipper common-carrier reports, the Authority's Bureau of Law Enforcement noted that a large portion of VinoShipper's wine was not being shipped from its licensed location in Windsor, California.

On November 15, 2019, Special Agent Haalman and Senior Special Agent Roy J. O'Connell spoke with Harrison, advising him that Virginia law allowed wine shipments into Virginia only from licensed locations.[8] Harrison responded, "Why would you pick it up and ship it back to California to only ship it out again? That's anti[-]commerce." Haalman and O'Connell suggested that VinoShipper could get a license for "every location [it] would . . . ship from," but Harrison replied that doing so would not be "practical [for] his business model."

---

[8] The Bureau's investigation was not limited to VinoShipper. As Haalman testified, "We are currently still looking at other businesses that may be operating illegally in the state and . . . there are some other matters that we're addressing as a result of that." The Bureau also filed "a few charges" against other shippers.

On December 10, 2019, Haalman and O'Connell spoke with VinoShipper's legal counsel, Sean O'Leary, who maintained that VinoShipper was shipping in compliance with Virginia law. The agents advised O'Leary, however, that Code § 4.1-203 required VinoShipper to obtain a license for each place from which wine was being shipped into Virginia. When asked if VinoShipper was still shipping wine from unlicensed locations, O'Leary responded, "I can't answer that."

Harrison admitted to the hearing officer that even after receiving the warning from agents Haalman and O'Connell, VinoShipper continued to ship wine into Virginia "from other locations than [its Windsor, California] address." From December 11 to December 31, 2019, VinoShipper made 86 shipments to Virginia customers from locations with a wine-shipper's license, 227 shipments to Virginia customers from locations lacking a Virginia shipper's license, and zero shipments to Virginia customers from its Windsor, California address.

In June 2020, ABC's Bureau of Law Enforcement requested a hearing on the charge that, between those dates in December 2019, VinoShipper

> sold and shipped wine other than as permitted by statute and by the Board's rules and regulations, in violation of Sections 4.1-203, 4.1-202, 4.1-209.1 and [4.1-225(1)(b)] of the Code of Virginia and 3 VAC 5-70-220 (i.e., shipped a product from an address for which the shipper is not licensed).

The hearing officer conducted a two-day evidentiary hearing, receiving documentary evidence and hearing testimony from the Bureau's agents and from Harrison.

At the close of evidence, the Bureau asked the hearing officer to revoke VinoShipper's license. The Bureau argued that the company had been aware since at least 2009 that it was violating the separate-license requirement by shipping wine into Virginia from unlicensed locations, and VinoShipper continued to do so even after being warned by agents Haalman and O'Connell. The hearing officer found that VinoShipper had shipped wine from unlicensed

- 11 -

locations during the December 2019 period charged. He rejected the company's theory that it needed a license only for its California address.

But the hearing officer declined the Bureau's request to revoke VinoShipper's license. He reasoned that VinoShipper "has not had any Board Orders or written warnings issued against it." He added that "the verbal warnings and the circumstances surrounding the charge do not justify revocation." Instead, the hearing officer suspended VinoShipper's shipping license for 25 days, giving VinoShipper the option to terminate the suspension by paying a $2,500 civil penalty.

VinoShipper appealed the hearing officer's findings to the ABC Board. After briefing and argument, the Board issued an order on December 21, 2020, adopting the hearing officer's decision and his proposed sanction. When VinoShipper appealed the Board's decision to the Circuit Court for the City of Richmond, the Board stayed the license suspension pending appeal. After briefing and argument, the circuit court reversed the Board's order, ruling from the bench that VinoShipper needed a license only for its office in California because that was the place from which it conducted its shipping business. The Authority noted a timely appeal.[9]

---

[9] The notice of appeal and the Authority's designation of assignments of error in this Court were signed by an assistant attorney general, with the Authority's in-house counsel also appearing on those pleadings. But only the Authority's in-house counsel signed the Authority's briefs and presented oral argument. After oral argument, we asked for and received from the parties supplemental briefing on whether Code § 4.1-103(5) required that the Authority continue to be represented here by the Office of Attorney General. We invited the Attorney General to file an amicus brief on that question but received no response.

Code § 4.1-103(5) provides that "[l]egal services for the Authority shall be provided by the Attorney General in accordance with Chapter 5 (§ 2.2-500 et seq.) of Title 2.2." Nonetheless, that provision was modified in 2019. *See* 2019 Va. Acts ch. 810. The second enactment clause of chapter 810 provided "[t]hat notwithstanding any other provision of law, the Board of Directors (the Board) of the [Authority] shall have the power to employ or retain in-house legal counsel to advise or represent the Authority in hearings, controversies, or other matters involving the interests of the Authority; however, upon request by the Board, the Attorney General shall provide legal services for the Authority in accordance with Chapter 5 (§ 2.2-500 et seq.) of Title 2.2." *Id.* The notwithstanding-any-other-provision-of-law modifier in

- 12 -

"The action of the [ABC] Board in suspending or revoking any license . . . [is] subject to judicial review in accordance with the Administrative Process Act [APA]." Code § 4.1-227. The circuit court's role in an APA appeal "is equivalent to an appellate court's role in an appeal from a trial court." *New Age Care, LLC v. Juran*, 71 Va. App. 407, 420 (2020) (quoting *Comm'r, Va. Dep't of Soc. Servs. v. Fulton*, 55 Va. App. 69, 80 (2009)). The party that appealed the agency decision to the circuit court—here, VinoShipper—bears the "burden . . . to . . . demonstrate an error of law subject to review by the court. Such issues of law include . . . compliance with statutory authority . . . or right as provided in the basic laws as to subject matter." Code § 2.2-4027.[10] A party aggrieved by the circuit court's decision may appeal to this Court. Code § 17.1-405(1)(i). VinoShipper's appeal to the circuit court and the Authority's appeal to this Court "rest[] entirely on statutory interpretation, which is a question of law that we review de novo." *Gaines v. Dep't of Hous.*, 71 Va. App. 385, 390 (2020).

---

the second enactment clause "overrides" the inconsistent language in Code § 4.1-103(5). *See Berry v. Bd. of Supervisors of Fairfax Cnty.*, ___ Va. ___, ___ (Mar. 23, 2023).

    Although it did not previously complain about the Attorney General's absence from the briefs and oral argument, VinoShipper argued in its response to our inquiry that the 2019 enactment clause does not authorize the Authority to be represented in litigation by in-house counsel alone. It argues that the Attorney General's absence on brief "arguably" warrants our dismissing the appeal.

    We disagree. The phrase "hearings, controversies, or other matters involving the interests of the Authority" is broad enough to include an administrative appeal under the Virginia Administrative Process Act. 2019 Va. Acts ch. 810. *Cf. Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Supervisors*, 285 Va. 87, 98 (2013) (stating that an actual "controversy" under the Virginia Declaratory Judgment Act must be one that is "ripe for judicial adjustment" (quoting *City of Fairfax v. Shanklin*, 205 Va. 227, 229 (1964))). Because the 2019 enactment clause authorized the Authority to be represented here by its in-house counsel, we see no ground on which to dismiss the appeal.

[10] Although appellate review of "an agency's factual findings 'is limited to determining whether substantial evidence in the agency record supports its decision,'" *Thormac, LLC v. Dep't of Alcoholic Beverage Control*, 68 Va. App. 216, 223 (2017) (quoting *Avante at Lynchburg, Inc. v. Teefey*, 28 Va. App. 156, 160 (1998)), neither party here challenges the findings of fact made by the hearing officer and adopted by the Board.

ANALYSIS

We conclude from the plain language of the separate-license requirement in Code § 4.1-203(A), and from the broader statutory context in which that requirement operates, that the ABC Act requires VinoShipper to obtain a license for each of the locations from which wine is shipped into Virginia at VinoShipper's direction.

### A. *The plain language of the statute*

We start with the statutory text: "Each license granted by the Board shall designate the *place* where the *business* of the licensee will be carried on." Code § 4.1-203(A) (emphasis added). Putting aside the limited statutory exceptions not applicable to VinoShipper (but discussed in part B below), "a separate license shall be required for each separate place of business." *Id.* This separate-license requirement has been part of the statutory scheme since the ABC Act was first enacted in 1934. *See* 1933-34 Va. Acts Extra Sess. ch. 94, § 23.[11]

We must therefore consider the "business" of a wine shipper and the "place" or places where that business is performed. The ABC Act does not define *business*, but the business of a wine shipper is evident from the statute itself: "Holders of wine . . . shipper's licenses . . . may *sell and ship* . . . wine" to Virginia customers. Code § 4.1-209.1(A) (emphasis added). The Act defines *sale* and *sell* to include "soliciting or receiving an order for; keeping, offering or

---

[11] The requirement was carried forward from a 1933 law legalizing the licensed sale of beverages containing alcohol not exceeding 3.2% by weight. *See* 1933-34 Va. Acts Extra Sess. ch. 3, § 8 ("Each such license as is hereinbefore provided for in this act shall designate the place where the business of the licensee will be carried on. A separate license shall be required for each separate place of business."). Although that licensing law was enacted before the end of Prohibition, Virginia legislators apparently viewed "beers and wines containing 3.2% or less of alcohol by weight as non-intoxicating," S. Doc. No. 5, *supra*, at 1, and therefore not plainly barred by the Eighteenth Amendment's prohibition on the sale of "intoxicating beverages." "Over time, the definitions of beer and wine came to include 3.2% beverages . . . ." *Bolick*, 199 F. Supp. 2d at 425 n.12. *See* Code § 4.1-100 (defining "Alcoholic beverages" as "containing one-half of one percent or more of alcohol by volume").

exposing for sale; peddling, exchanging or bartering; or delivering otherwise than gratuitously, by any means, alcoholic beverages." Code § 4.1-100.

The Act does not define *shipping*, however, "perhaps because the General Assembly felt the public and the courts would give it its plain, common-sense meaning." *Doggett v. Commonwealth*, 66 Va. App. 219, 225 (2016). Still, the parties vigorously disagree about what it means to *ship* wine. The Authority maintains that *shipping* includes all activities needed for the shipper to ship the wine. That includes activities of the wineries that, under contract with VinoShipper, select the wine, box it, affix the shipping and over-21 labels, and tender it to UPS for delivery to the customer. VinoShipper disagrees. It acknowledges that "the 'shipping' of goods does not consist of a single act, but is instead a 'process.'" VinoShipper Br. 15. But VinoShipper insists that the only legally significant step in that process is when VinoShipper tells UPS to pick up the shipment from the winery for delivery to the customer in Virginia. *Id.* at 16-17. And because VinoShipper directs that activity (and all other activities) from its office in Windsor, California, it says that the "shipping" takes place there and there alone. *Id.*

We agree with the Authority.

To understand the meaning of *shipping*, "[w]e need not go [further] than *Black's Law Dictionary* for its common meaning." *West Square, LLC v. Commc'n Technologies, Inc.*, 274 Va. 425, 436 (2007) (quoting *Sheets v. Castle*, 263 Va. 407, 413 (2002)). To *ship* means "[t]o send (goods, documents, etc.) from one place to another, [especially] by delivery to a carrier for transportation." *Ship*, *Black's Law Dictionary* (11th ed. 2019). *Accord Shipping*, *Webster's Third New International Dictionary* (2002) (defining *shipping* as "the act or business of one that ships").

Here, the business of selling and shipping wine includes those activities necessary for VinoShipper to "deliver[]" the wine, Code § 4.1-100 (definition of *sale* and *sell*), and "send" it to

- 15 -

the purchaser, *Ship*, *Black's Law Dictionary, supra*.  That means, broadly speaking, (1) receiving the customer's order; (2) purchasing the wine from the wineries; (3) selecting and packing the wine in boxes for shipment; (4) affixing the shipping and over-21 labels; and (5) tendering the package to UPS for delivery to the customer.  That VinoShipper delegates the third, fourth, and fifth steps to the wineries does not mean that VinoShipper does not perform those essential selling and shipping functions; it just does them through entities without their own Virginia license, using those entities' employees.

Turning to the "*place* where the business of the licensee will be carried on," Code § 4.1-203(A) (emphasis added), the ABC Act defines *place* expansively.  It includes, among other locations, all places where "the manufacture, bottling, *distribution*, use or *sale* of alcoholic beverages shall be performed, except that portion of any such building or other improvement actually and exclusively used as a private residence."  Code § 4.1-100 (emphasis added).

The ABC Act does not define the term *distribution* as used in the definition of *place*, so we look, once again, to the common understanding of the term.  *Distribution* means "[t]he act or process of apportioning or giving out. — distribute," *Distribution*, *Black's Law Dictionary*, *supra*; "[t]he disposition or arrangement in rational groups or classes," *Distribution*, *Webster's*, *supra*; and "[t]he action of dividing and dealing out or bestowing in portions among a number of recipients," *Distribution*, *Compact Edition of the Oxford English Dictionary* (1971) (O.E.D). The wineries with which VinoShipper contracts perform those functions on VinoShipper's behalf—they enable VinoShipper to "giv[e] out" and "distribute" the wine so as to "bestow[]" it upon the intended "recipient[]."  Those wineries select the wine, pack the boxes, affix the shipping and over-21 labels, and tender the shipment to UPS for delivery.  Those are essential components of *distribution*.

Those same functions are also essential to VinoShipper's *sale* of wine. As noted above, the ABC Act defines "sale" to include "exchanging" or "delivering otherwise than gratuitously." Code § 4.1-100. VinoShipper *exchanges* wine for its customers' money by *delivering* that wine to the customer. Without the selection, packaging, boxing, and tendering of the wine shipment to UPS for delivery to the customer, no such sale could occur.[12]

In short, VinoShipper performs essential portions of the business of selling and shipping wine at places not mentioned in its license, as it relies on its contract wineries to select, package, label, and tender the wine to UPS for delivery into Virginia. VinoShipper thus violated Code § 4.1-203(A) by failing to obtain "a separate license . . . for each separate place of business" in which "the business of the licensee will be carried on."

### B. The surrounding statutory context

The statutory context surrounding the separate-license requirement corroborates that the premises of the wineries with which VinoShipper contracts are places where VinoShipper's wine-shipping business is performed. Since 2010, the ABC Act has permitted wine shippers to avoid obtaining a license for locations where wine will be stored, packed, and shipped if the shipper delegates those functions to a Board-licensed "fulfillment warehouse." 2010 Va. Acts chs. 317, 561 (Code § 4.1-209.1(F)). "A 'fulfillment warehouse' means a business operating a warehouse and providing *storage, packaging, and shipping services to wineries . . . .*" Code § 4.1-209.1(F) (emphasis added). The Act authorizes a wine-shipper licensee to contract with a fulfillment warehouse to provide such services "*[n]otwithstanding the provisions of § 4.1-203*,"

---

[12] The statutory definition thus comports with the common understanding of the term *sale*: "[t]he transfer of property or title for a price," *Sale*, *Black's Law Dictionary*, *supra*; an "exchange of a commodity for money or other valuable consideration" *Sale*, O.E.D., *supra*; the "distribution (as of goods or services) by selling," *Sale, Webster's*, *supra*.

*id.*—in other words, as an *exception* to the separate-license-for-each-place-of-business requirement.

If VinoShipper were correct that a wine shipper performs no actual business in the locations where the wine is packed, boxed, and shipped at the shipper's direction, there would be no need for a fulfillment warehouse to be separately licensed. Or as the hearing officer put it, "If the legislature did not intend to generally prohibit shipper's licensees from having wine stored, packed, and picked from non-licensed locations, there would be no need to create an exception when done through an approved fulfillment warehouse."

Other statutory exceptions—enacted before and after the December 2019 period at issue here—reinforce our conclusion that VinoShipper may not ship wine from unlicensed locations. As of December 2019, Code § 4.1-203(A) imposed the separate-license requirement "[e]xcept as otherwise provided in §§ 4.1-207 [governing wine licenses] and 4.1-208 [governing beer licenses]." *See* 2015 Va. Acts ch. 412 (Code § 4.1-203(A)). Those statutes described when a single license could identify *other* locations where the licensee's business could take place. For instance, wine wholesalers could apply for a license to sell and ship their product "from *one or more premises identified* in the license." 2015 Va. Acts ch. 54 (Code § 4.1-207(2)) (emphasis added). Brewery licensees could be licensed "to sell at retail the brands of beer that the brewery owns *at premises described in the brewery license*." 2012 Va. Acts ch. 619 (Code § 4.1-208(1)) (emphasis added).

When the General Assembly amended and revised the exceptions in 2020, it continued to specify limited instances in which the separate-license requirement would not apply: "[e]xcept as otherwise provided in §§ 4.1-206.1 ["Manufacturer licenses"], 4.1-206.2 ["Wholesale licenses"],

and 4.1-206.3 ["Retail licenses"]." 2020 Va. Acts chs. 1113, 1114 (Code § 4.1-203(A)).[13]  Like the pre-2020 exceptions, these three statutes, in effect today, authorize a *single* license to reference *multiple locations* where the licensee's business will be performed.

- A farm-winery license may "authorize the licensee to sell wine at retail *at the places of business designated in the licenses*, which may include *no more than five* additional retail establishments of the licensee."  Code § 4.1-206.1(6) (emphasis added).

- A wholesale wine license may authorize the licensee "to sell and deliver or ship the wine *from one or more premises identified in the license*."  Code § 4.1-206.2(2) (emphasis added).

- And a mixed-beverage restaurant license, a type of retail license, may authorize the licensee to "sell and serve mixed beverages for on-premises consumption in dining areas *and other designated areas*," which may "include outdoor dining areas, *whether or not contiguous to the licensed premises*."  Code § 4.1-206.3(A)(1) (emphasis added).

In each of these instances, a single license with one business address suffices to specify the other locations where the licensee's business may also be performed.

Those careful and detailed exceptions show that the General Assembly has scrupulously applied the separate-license-for-each-place-of-business requirement.  There is no similar statutory exception for what VinoShipper does.  VinoShipper has declined, for example, to use a fulfillment warehouse licensed to provide "storage, packaging, and shipping services" to wine

_____

[13] The 2020 amendments to Code § 4.1-203 had an initial effective date of July 1, 2021, 2020 Va. Acts chs. 1113, 1114 (third enactment clause), but the date was postponed until January 1, 2022, 2021 Va. Acts Spec. Sess. I ch. 82 (second enactment clause).

shippers.[14]  The ABC Board thus correctly determined that VinoShipper violated the separate-license requirement by failing to obtain a license for each location at which shipping activities were performed on VinoShipper's behalf.

### C. The legislative purpose

Our construction of the separate-license requirement is also in harmony with the broad purpose of the ABC Act "to control the possession, sale, transportation, distribution, and delivery of alcoholic beverages in the Commonwealth . . . for the benefit of the citizens of the Commonwealth and for the promotion of their safety, health, welfare, and convenience."  Code § 4.1-101(A).  To achieve that purpose, the Act grants the ABC Board "plenary power" to regulate the "conditions under which alcoholic beverages are possessed, sold, transported, distributed, and delivered, so as to prevent any corrupt, incompetent, dishonest, or unprincipled practices and to promote the health, safety, welfare, convenience, and prosperity of the people."  *Id.*  The General Assembly has made clear that "[t]he Board's power to regulate shall be broadly construed."  Code § 4.1-111(F).  These broad provisions suggest that the General Assembly intended to exercise the full range of authority contemplated by Section 2 of the Twenty-first Amendment, which, as noted above, confers on "States virtually complete control over . . . how to structure the liquor distribution system."  *Granholm*, 544 U.S. at 488 (quoting *Midcal*, 445 U.S. at 110).

We are not persuaded by VinoShipper's claim that "no genuine regulatory concern" justifies requiring that it obtain a separate license for each location from which it ships wine into Virginia.  VinoShipper Br. 17.  Code § 4.1-204(F) gives the Authority the right during

---

[14] *See also* Code § 4.1-209.1(G) ("Notwithstanding the provisions of § 4.1-203, a wine and beer shipper licensee may sell wine or beer as authorized by this section through the use of the services of an approved marketing portal.").

reasonable business hours to inspect both the premises and records of the licensee's place of business:

> The Board and its special agents shall be allowed free access during reasonable hours . . . to the premises of . . . every wine and beer shipper licensee . . . for the purpose of examining and inspecting such place and all records, invoices and accounts therein.

As Special Agent Haalman testified, if there is no license for the places where shipping activities occur, "ABC does not have the ability to regulate or enforce Virginia laws should we have to."

One of those laws requires "[a]ll licensees shipping wine" to affix the over-21 labels to each package. Code § 4.1-209.1(C).[15] But VinoShipper has delegated that job to its contract wineries. So when, as here, those wineries are not covered by a Virginia ABC license, the Authority cannot inspect the premises to confirm that the required labels are being affixed.[16]

Having access to the places where the wine is packaged and shipped also gives the Authority access to the records of wine-shipping activities that occur at that location. A wine-shipper licensee must keep records showing "1. Number of containers shipped; 2. Volume of each container shipped; 3. Brand of each container shipped; 4. Names and addresses of recipients; and 5. Price charged." 3 VAC 5-70-220(E). Such records must be kept for two years

---

[15] Code § 4.1-209.1(C) provides:

> All licensees shipping wine or beer pursuant to this section shall affix a conspicuous notice in 16-point type or larger to the outside of each package of wine or beer shipped within or into the Commonwealth, in a conspicuous location stating "CONTAINS ALCOHOLIC BEVERAGES; SIGNATURE OF PERSON AGED 21 YEARS OR OLDER REQUIRED FOR DELIVERY."

[16] To be sure, licensed common carriers must "refuse delivery when the proposed recipient appears to be under the age of 21 years and refuses to present valid identification." Code § 4.1-209.1(C). But the statute contemplates that the shipper and the common carrier both play a role in enforcing the over-21 requirement. *See id.* ("The common carrier and the shipper licensee shall be liable only for their independent acts.").

and must be "made available for inspection and copying by any member of the [ABC Board] or its special agents upon request." *Id.* True, VinoShipper keeps its own record of shipping transactions. But without the right to inspect the premises and records of the places that package and ship wine on VinoShipper's behalf, the Authority cannot check the information at its source to confirm that VinoShipper's records are accurate.[17]

VinoShipper is skeptical of the regulatory value of the Authority's inspection rights. The company points to Special Agent Haalman's testimony that the Authority has not yet conducted an on-site inspection of any out-of-state wine shipper. Maybe so. But the ABC Act vests the Authority with discretion to determine whether and when to use its statutory inspection powers. That regulatory authority is not forfeited through non-use.[18]

\* \* \*

VinoShipper may have developed an innovative and efficient wine-shipping model that is ideal for a "'just-in-time' digital economy," VinoShipper Br. 24, but that model does not currently comply with Virginia law. The General Assembly has amended the ABC Act to account for technological innovations. *See, e.g.*, 2020 Va. Acts chs. 1113, 1114 ("Internet wine and beer retailer license"); 2010 Va. Acts ch. 317 ("fulfillment warehouse" and "marketing portal" licenses). *See also supra* note 7. Whether the ABC Act should be amended again to accommodate VinoShipper's business model is the General Assembly's choice, not ours.

---

[17] The fulfillment-warehouse exception avoids that problem because the Authority can inspect the premises and records of the warehouse licensee. *See* Code § 4.1-209.1(F) (requiring "Board-approved fulfillment warehouse" to "maintain such records and . . . submit to the Board such information as the Board may prescribe," and requiring that the shipper "enter into a contract designating the fulfillment warehouse as the agent of the shipper").

[18] Should it choose to inspect the premises of an out-of-state licensee, the Authority need not send its own agents; it can instead "engage the services of alcoholic beverage control authorities in any state to assist with the inspection of the premises of a . . . shipper licensee." Code § 4.1-204(F).

CONCLUSION

The requirement in Code § 4.1-203(A) that a licensee obtain "a separate license . . . for each separate place of business" requires that a wine shipper like VinoShipper obtain a license for every place where its shipping activities occur. That includes locations where wine—at the shipper's direction—is boxed, labeled, and tendered to the common carrier for delivery to the customer. The separate-license-for-each-place-of-business requirement attaches unless a statutory exception applies, such as when a shipper uses a Board-licensed "fulfillment warehouse" to perform those shipping functions, Code § 4.1-209.1(F), an option that VinoShipper did not use here.

The ABC Board thus committed no "error of law," Code § 2.2-4027, when it temporarily suspended VinoShipper's license after concluding that VinoShipper had shipped wine into Virginia from unlicensed locations during the month of December 2019. The circuit court's judgment is reversed, and the ABC Board's order of December 21, 2020 is reinstated.

*Reversed.*